IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| E.F., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | NO. 1:20-cv-04373-SDG |
| RED ROOF INNS, INC., | ) | |
| RED ROOF FRANCHISING, LLC, | ) | |
| HJA ENTERPRISES INC., and | ) | |
| SAI NATIONAL HOSPITALITY | ) | |
| VENTURES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff in the above-styled action and hereby files this her First Amended Complaint as follows:

1.

Sex trafficking and prostitution have long been common occurrences at Red Roof Inns in Atlanta. All the named Defendants knew or should have known this for the reasons in this complaint. Plaintiff E.F. knows this because she was trafficked for sex at four different Atlanta Red Roof Inn motels for more than a decade, beginning when she was 15 years old.

2.

Sex trafficking and prostitution are common occurrences at Red Roof Inn motels in Atlanta because Defendants, with the help others, chose to ignore, condone, facilitate, support and/or permit sex trafficking and prostitution at its hotels. Defendants' liability to Plaintiff for its actions is straightforward:

a) As set forth herein, the Red Roof Inn locations in this lawsuit were ventures in which Defendants participated. Defendants benefited from these ventures and should have known that these ventures violated the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1591, *et seq*. ("TVPRA"). As such, Defendants are liable to Plaintiff for her damages resulting from being sex trafficked at Red Roof Inn motels.

b) Keeping a place of prostitution is illegal in Georgia. Defendants knowingly permitted the hotels over which they exerted control to be used for the purpose of prostitution. Plaintiff was injured by Defendants keeping a place of prostitution because she was not a willing prostitute, she was a victim—at times a minor victim—of sex trafficking at four Red Roof Inn motels which were places of prostitution. As such, Defendants are liable to Plaintiff for her

damages under the Georgia Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-1 *et seq.* ("Georgia RICO").

c) Defendants negligently breached duties imposed by Georgia law, assumed by contract, and voluntarily undertaken at the Atlanta Red Roof Inn motels in this case. Defendants knew or should have known of the foreseeable risk of sex trafficking and prostitution at these Atlanta Red Roof Inn motels and failed to act as similarly situated businesses would in like circumstances. As such, Defendants are liable to Plaintiff for her damages under Georgia common law.

3.

At the age of 15, E.F. was trafficked as a minor from 2007 through 2009 at a Red Roof Inn, located at 1200 Virginia Avenue, Atlanta, Georgia, 30344 (the "Red Roof Airport North"). At all times pertinent to this time period and the events alleged herein, this motel was operated under Franchisor Contracts between the franchisee and the franchisor, which was Defendant Red Roof Inns, Inc. (RRI) and/or Defendant Red Roof Franchising, LLC (RRF).

4.

E.F. was also trafficked as a minor in 2007 at the Red Roof Inn located at 2200 Corporate Plaza, Smyrna, Georgia, 30080 (the "Smyrna Red Roof"). At all

times pertinent to this time period and the events alleged herein, the motel was operated by RRI and/or RRF.

5.

From 2013 through 2019, E.F. was trafficked at the Red Roof Inn located at 4430 Frederick Drive SW, Atlanta, Georgia, 30336 (the "Fulton Industrial Red Roof Inn"). From January 24, 2018 to the present, this motel has been operated by Defendant Sai National Hospitality Ventures, LLC (Sai) under Franchisor Contracts with Defendant RRF.

6.

E.F. was also trafficked in 2019 at the Red Roof PLUS+ located at 2450 Old National Parkway, College Park, Georgia, 30349 (the "Red Roof Airport South"). From April 20, 2018 to the present, this motel has been operated by Defendant HJA Enterprises Inc. (HJA) under Franchisor Contracts with Defendant RRF.

7.

These four motels are referred to collectively as the "Atlanta Red Roof Inns."

8.

Given the nature of the case, E.F. is identified in this Complaint only by generic initials to prevent public disclosure of E.F.'s name. Plaintiff's counsel has

either previously disclosed E.F.'s full name to defense counsel or will immediately upon identification of additional counsel. Upon information and belief, all parties consent to proceeding by using E.F.'s initials.[1]

## PARTIES, JURISDICTION, AND VENUE

9.

E.F. is a citizen of the United States of America, is a resident of the State of Georgia, and consents to the jurisdiction of this Court. At all relevant times, Plaintiff suffered from mental disabilities and mental illness. E.F. was born in October of 1992 and, therefore, was a minor when she was sex trafficked prior to October 2010, as alleged herein. During all relevant periods, including before and up to February 5, 2020, when Plaintiff was rescued from trafficking, having been subject to hundreds of statutory rapes before she turned 18 and, thereafter, to commercial sex resulting from force, fraud, or coercion until February 2020, Plaintiff was suffering from a mental disability, horrific, serial traumas, and was psychologically imprisoned by her traffickers.

[1] Contemporaneously with this Complaint, Plaintiff filed a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in the Complaint, which include sex trafficking of a minor child, as well as for E.F.'s own personal safety.

10.

a) Defendant Red Roof Inns, Inc. (RRI) is a Delaware corporation with its principal place of business in New Albany, Ohio. RRI may be served with process by serving its registered agent Corporation Service Company at 40 Technology Parkway South, Suite 300, Norcross, Georgia, 30092.

b) Defendant Red Roof Franchising, LLC (RRF) is a subsidiary of RRI and is a Delaware Limited Liability Company with a principal business address of 605 South Front Street, Columbus, Ohio 43215. RRF may be served with process by serving its registered agent. RRI and RRF regularly conduct business in the State of Georgia, derive substantial revenue from services rendered in Georgia, and have committed tortious acts or omissions both within and outside Georgia, resulting in injuries in Georgia.

c) Defendant HJA Enterprises Inc. (HJA) is a Georgia corporation with its principal place of business located at 2450 Old National Hwy., College Park, Georgia 30349. It operates the motel specified in ¶ 6 above. It may be served with process by serving its registered agent Suresh K. Patel, 506 Cypress Point, McDonough, Georgia 30253.

d) Defendant Sai National Hospitality Ventures, LLC (Sai) is a Texas corporation. It operates the motel specified in ¶ 5 above. It may be served with

process by serving its registered agent, Hermanth Akkanti, 201 Childress Drive, Suite 110, Bastrop, Texas 78602.

11.

At all times relevant to this complaint, RRI and/or RRF managed, supervised, operated, oversaw, controlled the operation of, and/or was inextricably connected to the renting of rooms at Atlanta Red Roof Inns, from which it benefited financially. RRI controls RRF and is vicariously liable for its acts.

12.

This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under 18 U.S.C. 1595(a), and pursuant to 28 U.S.C. § 1367 because Plaintiff's state law claims form part of the same case or controversy as her federal law claims.

13.

Defendants are subject to personal jurisdiction in this district and division.

14.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action is brought.

## THE PARTIES' ROLES

15.

RRI and/or RRF are the franchisors of the Red Roof Inns brand and are providers of guest lodging facility services, including at the Atlanta Red Roof Inns in this lawsuit.

16.

At all relevant times, franchisee companies operating under Franchisor Contracts between the franchisees and the franchisor, which was RRI and/or RRF, operated the Atlanta Red Roof Inns, except for the Smyrna Red Roof Inn, which RRI and/or RRF corporately operated at the pertinent times alleged.

17.

RRI and/or RRF accepted and ratified the conduct of these franchisee companies, including but not limited to HJA and Sai (collectively, the franchisee companies are referred to as "Owners") and their employees, agents, and representatives as alleged herein.

18.

In exchange for a percentage of the revenue from room rentals at the Atlanta Red Roof Inns, including the rooms in which Plaintiff was trafficked, RRI and/or

RRF controlled, managed, and operated the Atlanta Red Roof Inns and permitted widespread prostitution and sex trafficking on the premises.

19.

Through its Franchisor Contracts, RRI and/or RRF control[2] the policies and operations of the subject Atlanta Red Roof Inns. RRI and/or RRF dictate the terms of these policies and procedures.

20.

RRI and/or RRF control the day-to-day operations of the Atlanta Red Roof Inns. RRI and/or RRF enter contracts with franchisees, including the Owners, that incorporate and bind their franchisees to many other documents, contracts, and programs. These contracts and programs include the Franchisor Contract, the Standards Manual, the RediCard Member Program, Reservation System and

[2] For clarity, and in the interest of making her statement short and plain, Plaintiff uses the present tense to refer to the relationship between RRI and/or RRF and the Franchisee Defendants, some of which ended many years ago and some of which are ongoing. Plaintiff intends such references to apply only to the time periods relevant in this lawsuit. In the case of the Red Roof Airport North, that time period ended on or about the end of 2009 when the relationship between RRI and/or RRF and the owner ended through the owner's bankruptcy and the property at 1200 Virginia Avenue ceased being an RRI-branded hotel. In the case of the Smyrna Red Roof, that time period is during 2007. In the case of the Fulton Industrial Red Roof, RRI and/or RRF granted franchisee rights for this property from roughly the beginning of 2013 to the present. In the case of Red Roof Airport South, RRF granted franchise rights for this property from on or about 2018 to the present.

Marketing Program, the Volume Plan Plus Program, the RediBill Program, the RediStay Program, and the Red Advantage Training Program, among others, which provide *mandatory* policies, procedures, and operational practices that control and controlled nearly every aspect of the Atlanta Red Roof Inns' daily operations. These documents are collectively referred to as the "**Franchisor Contracts**."

21.

RRI and/or RRF exert an unusual amount of control over its franchisees, including the Owners, compared to other hotel brands. RRI and/or RRF President and CEO Andrew Alexander has stated, "Our relationship with our franchisees is as close as you can get." Alexander further stated that franchisees have "direct access to him and other leaders at the company, something that's unheard of at larger franchising companies." Prior to becoming President and CEO in 2009, Alexander was the Senior Vice President and General Counsel of RRI and/or RRF from 2007 to 2009.

22.

The Owners are very aware of the "exacting standards" and control RRI and/or RRF impose over their businesses. Harshvina Zaver, president of DILA, Inc., a former owner of the Fulton Industrial Red Roof, has testified regarding the

Fulton Industrial Red Roof that, "Once we are a [Red Roof] franchise property we are required to go by every rule in that standards manual." Ms. Zaver further testified that RRI has "a system in place where they have a website [that] shows the trip advisor scores of people that have stayed at our property. If we have people staying at our place that are not happy, that goes immediately to our website. . . . So in order to keep a good reputation, we have to keep our guests happy. If we do not, they will give us a warning, whereby they give us a certain time period to correct any issues. Then if we still are not able to correct them, we would be terminated."[3]

23.

Ms. Zaver was asked whether RRI has "provisions for being required to provide security for the safety of guests?" and testified, "Correct."[4]

24.

At a hearing regarding high crime at the location of the Fulton Industrial Red Roof, DILA's attorney explained RRI's exacting standards more fully:

> I might add that as a Red Roof franchisee my client has a substantial liability to Red Roof. If the franchise is not maintained, they have personal liability for breakage and termination fees to Red Roof. If

[3] Hearing Transcript, June 6, 2013, Fulton County, Georgia v. Zaver, Fulton County, Georgia, Fulton County Department of Health Services 31:2–3; 31:18–25; 32:1-4, referred to hereafter as "Hearing Transcript."
[4] *Id.*at 32:5–7.

> they don't adhere to the Red Roof standards, relative security, and maintenance and operation of the property and that franchise is terminated or revoked, they can be subjected to substantial penalties by Red Roof.[5]

25.

Through the Franchisor Contracts, RRI and/or RRF control the Owners and the operations of the Atlanta Red Roof Inns by requiring compliance with hundreds of mandatory requirements and prohibitions that dictate how staff at the Atlanta Red Roof Inns interact with guests and conduct all business operations.

26.

These requirements are not suggestions. The Owners' employees must comply with the terms of the Franchisor Contracts and the numerous policy documents referenced therein. The Franchisor Contracts inform that "every detail of the System is important to Franchisor . . . in order to develop and maintain the Standards and public image of the System . . . Franchisee agrees to comply with the Standards and not deviate from them." Other documents in the Franchisor Contracts "contain[] mandatory . . . . specifications, standards, operating procedures and rules periodically prescribed by us for use in the operation of an Inn."

---

[5] *Id.* at 11:25, 12:1-8.

27.

RRI and/or RRF control, among many other hotel functions at the Atlanta Red Roof Inns, employee and management training and supervision; employee interaction with guests at the hotels; food, supplies, products, and amenities available in the hotels; the hotels' online reputation management; and guest reservation and booking, including check-in and check-out, rates and room inventory, front desk record-keeping, and other essential tasks.

28.

RRI and/or RRF train employees of the Atlanta Red Roof Inns through the RED Advantage Training Program, Field Training Program, Quality Training Program, and Continuing Education Program. This training is mandatory for employees and managers at the Atlanta Red Roof Inns.

29.

RRI and/or RRF conduct mandatory training of every general manager of the Atlanta Red Roof Inns through its RED Advantage Training Program. This training, which lasts 8 and a half days and is conducted at RRI and/or RRF's training center in Ohio, covers every aspect of the hotels' operations and includes further mandatory requirements the hotels and their staff must abide by.

30.

RRI and/or RRF conduct mandatory training of every guest service representative and manager at the Atlanta Red Roof Inns through its Field Training Program, during which RRI and/or RRF employees travel to the Atlanta Red Roof Inns to train all categories and types of franchisee employees, including front desk and guest relations, housekeeping, and maintenance on all aspects of their job requirements and the operation of the Atlanta Red Roof Inns, including customer service, booking and reservations, audit and accounting procedures, among others.

31.

At its option, RRI and/or RRF may require franchisees, including the Owners, to pay for further mandatory remedial training from RRI and/or RRF if the franchisee hotel fails to meet quality or guest satisfaction requirements, including scores impacted by meticulously-tracked online reviews.

32.

Pursuant to the Franchisor Contracts, RRI and/or RRF reserve the right to discontinue and terminate its relationship with the Owners if it determines that a particular hotel does not meet its quality standards "or otherwise fails to maintain Franchisor's Standards or comply with Franchisor's procedures as set forth in the Manuals[.]"

33.

RRI and/or RRF own, control, and operate RediStay, the reservation system at the Atlanta Red Roof Inns. RRI and/or RRF own and provide the software, equipment, communications facilities, personnel and services to operate the system. The RediStay system books reservations, performs check-in and check-out functions, manages rates and room inventory, collects and transmits data from guests to RRI and/or RRF and automates front desk and operational record keeping for the hotels. There are no functions more essential to the day-to-day operations of the Atlanta Red Roof Inns than the booking of rooms for money, which is controlled entirely by RRI and/or RRF through this mandatory program. The valuable guest information and data the RediStay system collects is transmitted directly to RRI and/or RRF for its benefit.

34.

Unlike many other hotel brands, RRI and/or RRF exert substantial control over the Atlanta Red Roof Inns' security operations and *require* the Owners' employees to report *every* safety or security incident at the property, including arrests, directly to RRI and/or RRF. RRI and/or RRF also require the Owners to consult with RRI and/or RRF before speaking with the media regarding these safety and security incidents.

35.

RRI and/or RRF maintain an extensive online reputation management system that closely monitors and scrutinizes social media references, online reviews, complaints, news reports, and other references to its hotels, including the Atlanta Red Roof Inns, in real time. Through its systems, RRI and/or RRF monitor all publicly-available reviews of the Atlanta Red Roof Inns, receive customer surveys and complaints directly, manage feedback from those communications, and monitor safety threats, police reports, and news articles involving the Atlanta Red Roof Inns. RRI and/or RRF analyze this data and deliver analysis, feedback, direction, and ultimatums to hotels and franchisees daily, including the Owners and the Atlanta Red Roof Inns.

36.

Executives at RRI and/or RRF also monitor online reviews and routinely contact the Owners regarding particular negative reviews online. It is common for these executives to also respond directly to guests online regarding particular reviews. RRI and/or RRF also require franchisees, including the Owners, to respond to negative online reviews within a certain time period.

37.

RRI and/or RRF also knew or should have known of the reviews in this Complaint and other reviews not only because of the monitoring referenced above, but also because RRI and/or RRF published such online reviews on their own website, www.redroof.com.

38.

RRI and/or RRF uses its online reputation management system to exert substantial control over its hotel locations and franchisees, including the Owners. Using this information, RRI and/or RRF has at times chosen to revoke its brand from some hotels. In other words, RRI and/or RRF receives daily information about the operation of the ventures it is a part of, and RRI and/or RRF may choose to no longer profit from those ventures.

39.

Despite having knowledge about its hotels with rampant crime, prostitution, and sex trafficking—like the Atlanta Red Roof Inns—RRI and/or RRF condoned and/or permitted prostitution and sex trafficking at its hotels so long as it remained profitable for RRI and/or RRF to do so. For example, in September 2015, RRI and/or RRF terminated its Franchisor Contracts with a hotel in Charlotte, North Carolina after the hotel was the subject of media scrutiny following a prostitution

sting that uncovered child sex trafficking at the hotel during the 2012 Democratic National Convention.[6] RRI and/or RRF only pulled its brand from the hotel when federal prosecutors instituted an action to seize the property and shut down the hotel. At the time, a RRI and/or RRF spokesman stated, "Red Roof Inn has terminated its Franchisor Contract with the Inn located at 3300 Queen City Drive, Charlotte, N.C. Once we were made aware of the situation, swift and immediate action was taken to terminate this franchisee's agreement with the brand."[7]

40.

In contrast with its public posturing, *a mere three months later*, RRI and/or RRF was specifically and directly informed of sex trafficking, including minor sex trafficking, given the name of the suspected sex trafficker, and sent pictures and information connecting that sex trafficker to employees at the Smyrna Red Roof Inn. Despite having this information, and despite having been sued by multiple sex trafficking victims since then for sex trafficking at the Smyrna Red Roof, RRI and/or RRF has never pulled its brand from the Smyrna Red Roof.

---

[6] *Feds Look into Sex Trafficking at Charlotte Hotel*, Associated Press, (Sept. 18, 2015), https://www.citizen-times.com/story/news/2015/09/18/feds-look-sex-trafficking-charlotte-hotel/72386068/ (last visited Oct. 23, 2020).
[7] *Charlotte Hotel at Center of Sex Trafficking Allegations*, WCNC Charlotte (Sept. 16, 2015), https://www.wcnc.com/article/news/crime/charlotte-hotel-at-center-of-sex-trafficking-allegations/275-213056842 (last visited Oct 23, 2020).

41.

In other words, within a three-month window, RRI and/or RRF received similar information regarding sex trafficking at two hotel locations (one in Charlotte and another in Smyrna), but only terminated its franchise with the Charlotte location that was seized and auctioned by federal prosecutors. The timing and circumstances of these two decisions support the inference that RRI and/or RRF condones and permits prostitution and sex trafficking at the hotels it controls so long as it remains profitable for it to do so.

42.

Similarly, RRI and/or RRF demonstrated its knowledge of prostitution and sex trafficking at the Red Roof Airport North in its filings in the bankruptcy case *In re: Diplomat Construction, Inc.*, Case No. 09-68613-MGD (N.D. Ga. 2009), involving the former owner of the Red Roof Airport North, Diplomat Construction, Inc. Though RRI and/or RRF received direct reports that its hotel staff knew pimps and prostitutes operated out of the Red Roof Airport North, ultimately, the only transgression that prompted RRI and/or RRF to attempt to terminate the franchise was when Diplomat's payments to RRI and/or RRF were short.

43.

More than just exemplifying that RRI and/or RRF condones and permits prostitution and sex trafficking when it is financially beneficial for it to do so, the 2015 communications with RRI and/or RRF provided knowledge to RRI and/or RRF that prostitution and sex trafficking were endemic at its hotels in the Atlanta area, which at the time was well-known as an epicenter of minor sex trafficking in America.

44.

In 2015, a website named www.atltrafficking.com ("ATLTrafficking"), began reporting numerous instances of sex trafficking at hotels in Atlanta, particularly at the Smyrna Red Roof.

45.

ATLTrafficking specifically identified by name and photograph traffickers staying at the Smyrna Red Roof and quoted an employee "admit[ing] that much of the information contained in" an article published on the site "regarding sex trafficking occurring in their rooms is true" and "confirm[ing] that the national Red Roof Corporate office is aware of the situation, as well as the franchise owner."

46.

ATLTrafficking published an article that posed the question: "What will it take for Red Roof Corporate (614-744-2600) to pull the franchise rights from this owner?" The article suggested that "Concerned citizens should call the Cobb County elected officials as well as the Red Roof Corporate offices right away," and provided contact information for RRI and/or RRF, its communications department, and its public relations agency.

47.

ATLTrafficking published another article about the Smyrna Red Roof that stated, among other things:

a) "Any day of the week, dozens of girls are trafficked out of this location, some of whom look underage, even as young as 12." and;

b) "Private investigators recently observed a young woman being trafficked repeatedly at the Red Roof in Smyrna over a 3 day period while her 7 week old baby slept at the foot of the bed in which she was entertaining 'client' after 'client.'"

48.

In December 2015, a hospitality industry executive and anti-trafficking advocate sent these and other articles directly to Andrew Alexander, RRI and/or

RRF's president and CEO. She spoke with Mr. Alexander on the phone and told him of the rampant and ongoing commercial sex trafficking occurring at the Smyrna Red Roof.

49.

The hospitality executive identified to Mr. Alexander a suspected trafficker who was listed on the Georgia Sex Offender Registry. The executive told Mr. Alexander this was just "[o]ne example of Red Roof Inn appearing to be involved in trafficking."

50.

Mr. Alexander's only response was to have RRI and/or RRF's general counsel, George Limbert, call the hospitality executive to find out who ran the website where the articles were published.

51.

The hospitality executive then sent Mr. Limbert the same information previously sent to Mr. Alexander and asked when the company would take action to address the open sex trafficking at the Smyrna Red Roof.

52.

Two weeks later, the hospitality executive emailed Mr. Alexander yet again, copying the company's general counsel, Mr. Limbert, alerting them that the previously identified trafficker "appears to be using your hotel regularly."

53.

Among other things, the email reported that the trafficker "was seen outside your manager's office last night [at the] Red Roof Inn mentioned in the report [the Smyrna Red Roof]. His background is very clear[,] and he appears to be using your hotel regularly and is quite friendly with your manager. . . . I hope Red Roof takes action on this sad situation."

54.

Despite this direct knowledge of its highest executives, RRI and/or RRF did not take any action to deter or prevent prostitution and sex trafficking at the Atlanta Red Roof Inns. Facing no direct threat of economic losses, RRI and/or RRF chose to continue to condone and/or permit prostitution and sex trafficking at the Atlanta Red Roof Inns.

55.

RRI and/or RRF knew or should have known that its hotels are well known around the country as havens for sex trafficking ventures. Sex trafficking ventures

at Red Roof Inns nationwide have been widely reported for years.[8] Because the income from these hotels was never directly threatened, RRI and/or RRF chose to

---

[8] *See, e.g.*, Joe Marusak, *Feds Oversee Sale of Former Charlotte Red Roof Inn that Harbored Teen Sex Trafficking*, The Charlotte Observer, (Aug. 2, 2016), https://www.charlotteobserver.com/news/local/crime/article93210577.html (last visited Oct. 23, 2020); Maria Salazar, *Houston Attorney Sues Hotels in Sex Trafficking Case Involving 15-year-old Girl*, Fox 26, (May 15, 2019), http://www.fox26houston.com/good-day/morning-news/houston-attorney-sues-hotels-in-a-sex-trafficking-case-involving-a-15-year-old (last visited Oct. 23, 2020); Erick Payne, *Two People Face Charges for Involvement in Trafficking Ring*, WCIA, (July 25, 2018), https://www.wcia.com/news/local-news/two-people-face-charges-for-involvement-in-trafficking-ring/ (last visited Oct. 23, 2020); Carl Hamilton & Josh Shannon, *Indictment: Alleged Sex Traffickers Held Abducted Teen at Newark Motel*, Newark Post, (Feb. 26, 2018), https://www.newarkpostonline.com/news/indictment-alleged-sex-traffickers-held-abducted-teen-at-newark-motel/article_484c66f0-bab7-5cf9-a175-2d989728b25f.html (last visited Oct. 23, 2020); Joe Currier, *Man Charged with Sex Trafficking at Red Roof Inn in St. Louis*, St. Louis Post-Dispatch, (June 30, 2017), https://www.stltoday.com/news/local/crime-and-courts/man-charged-with-sex-trafficking-at-red-roof-inn-in/article_4c70ac45-ac34-5d28-bd3c-92efde095381.html (last visited Oct. 23, 2020); Alana Broe, *Sex, Drugs, and Res Gestae: The Eighth Circuit Says Evidence is "Inextricably Related" to Sex Trafficking*, Matters, (2018), https://www.traffickingmatters.com/sex-drugs-and-res-gestae-the-eighth-circuit-says-evidence-is-inextricably-related-to-sex-trafficking/ (last visited Oct. 23, 2020); Allison Dunn, *Victim: 'Father Figure' Haynes Manipulated her in Sex-Trafficking Case*, Toledo Blade, (March 26, 2019), https://www.toledoblade.com/local/courts/2019/03/26/victim-testifies-in-pastor-anthony-haynes-sex-trafficking-case/stories/20190326115 (last visited Oct. 23, 2020); Roberto Acosta, *Mother Accused of Sex Trafficking 6-year-old Daughter Appears in Court*, MLive, (July 15, 2019), https://www.mlive.com/news/flint/2019/07/mother-accused-of-sex-trafficking-6-year-old-daughter-appears-in-court.html (last visited Oct. 23, 2020); *Cincinnati Man Pleads Guilty to Sex Trafficking by Force, Fraud, and Coercion*, Department of Justice, (Nov. 14, 2014) https://www.justice.gov/opa/pr/cincinnati-man-pleads-

guilty-sex-trafficking-force-fraud-and-coercion (last visited Oct. 23, 2020); Press Release, *Two From Minneapolis Sentenced for Sex Trafficking*, Department of Justice, (June 9, 2015), https://www.justice.gov/usao-sd/pr/two-minneapolis-sentenced-sex-trafficking (last visited Oct. 23, 2020); Kevin Lewis, *Teenage Prostitution Ring Busted, Pimp Claims to Also Work as School Bus Driver*, CBS Austin, (March 4, 2016), https://cbsaustin.com/news/offbeat/teenage-prostitution-ring-busted-pimp-claims-to-also-work-as-school-bus-driver-03-04-2016-154655883 (last visited Oct. 23, 2020); Amani Booker, *2 Face Federal Sex Trafficking Charges*, Milwaukee Journal Sentinel (June 16, 2010), http://archive.jsonline.com/news/crime/96508359.html/ (last visited Oct. 23, 2020); Joseph Kohut, *Scranton Sex Trafficking Cases Move Forward*, Pocono Record, (Dec. 4, 2016), https://www.poconorecord.com/news/20161204/scranton-sex-trafficking-cases-move-forward (last visited Oct. 23, 2020); *2 Charged with Human Trafficking at Jessup Red Roof Inn*, CBS Baltimore, (July 23, 2019), https://baltimore.cbslocal.com/2019/07/23/2-charged-with-human-trafficking-at-jessup-red-roof-inn/ (last visited Oct. 23, 2020); Matt Chandler, *Alleged Underage Sex Trafficking in Amherst*, Buffalo Business First, (Dec. 17, 2012), https://www.bizjournals.com/buffalo/news/2012/12/17/alleged-underage-sex-trafficking-in.html (last visited Oct. 23, 2020); Katie Kather, *13 Men Charged in Woodbury Sex-with-Minors Sting*, Twin Cities Pioneer Press, (Sept. 21, 2015) https://www.twincities.com/2015/09/21/13-men-charged-in-woodbury-sex-with-minors-sting/ (last visited Oct. 23, 2020); Felix Sarver, *Joliet Hotel Among Meeting Places in Rappers' Sex Trafficking Ring*, The Herald-News, (Jan. 18, 2016) https://www.theherald-news.com/2016/01/18/joliet-hotel-among-meeting-places-in-rappers-sex-trafficking-ring/alh59bo/ (last visited Oct. 23, 2020); *23-Year-Old Nashville Man Faces 18 Charges after Prostitution Sting at Donelson Hotel*, End Slavery Tennessee, (June 24, 2014), https://www.endslaverytn.org/news/23yearoldnashvillemanfaces18chargesafterprostitutionstingatdonelsonhotelnewsarticle (last visited Oct. 23, 2020); Jason Green, *Berkely Man Gets Life Sentence for Prostituting Teen*, The Mercury News, (July 21, 2017), https://www.mercurynews.com/2017/07/21/berkeley-man-gets-life-sentence-for-prostituting-teen/ (last visited Oct. 23, 2020); Patrick Dunn, *A Road Back from Walking the Streets*, Ann Arbor Observer, (April, 2014), https://annarborobserver.com/articles/a_road_back_from_walking_the_streets.html#.XUg6Tm9KjZk (last visited Oct. 23, 2020); David Owens, *Hartford Man Sentenced to Prison for Sex Trafficking of 15-year-old Girl*, The Morning Call,

continue to profit from the sex trafficking and prostitution at its hotels, including the Atlanta Red Roof Inns.

56.

RRI and/or RRF executives also regularly inspect the Atlanta Red Roof Inns to check for compliance with its many mandatory policies. Multiple RRI and/or RRF executives regularly visited the subject Atlanta Red Roof Inns and stayed for

---

(Nov. 14, 2016), https://www.mcall.com/hc-sex-trafficking-teenager-prison-1115-20161114-story.html (last visited Oct. 23, 2020); Tim Logue, *Chester Man Gets Life in Jail for Sex Trafficking*, Daily Times, (Dec. 19, 2014), https://www.delcotimes.com/news/chester-man-gets-life-in-jail-for-sex-trafficking/article_03bf3c6e-62cc-5fa6-b531-0ac7ab630e85.html (last visited Oct. 23, 2020); Joseph Paul, *Men Accused of Promoting Prostitution in Lafayette*, Journal & Courier, (Dec. 27, 2016), https://www.jconline.com/story/news/crime/2016/12/27/men-accused-promoting-prostitution-lafayette/95870334/ (last visited Oct. 23, 2020); *Man, Woman Charged with Pimping Women out of Pooler Hotel*, WTOC, (Dec. 29, 2014), https://www.wtoc.com/story/27724967/man-woman-charged-with-pimping-women-out-of-pooler-hotel/ (last visited Oct. 23, 2020); *Farragut Man Faces Federal Sex Trafficking Charges*, WBIR 10, (April 7, 2015) https://www.wbir.com/article/news/farragut-man-faces-federal-sex-trafficking-charges/93434205 (last visited Oct. 23, 2020); Katie Eubanks, *Sex Trafficking Victim Shares Story*, Clarion Ledger, (April 16, 2015) https://www.clarionledger.com/story/news/2015/04/16/sex-trafficking-victim-shares-story/25919625/ (last visited Oct. 23, 2020); Eric T. Berkman, *Alleged Sex Trafficker Can't be Compelled to Unlock Phone*, LeagalNews.com, (Aug. 18, 2017), http://legalnews.com/detroit/1446866 (last visited Oct. 23, 2020); Sam Wood, *Pimp 'Gucci Prada' Gets Life for Forcing Child into Prostitution*, The Philadelphia Inquirer, (Dec. 18, 2014), https://www.inquirer.com/philly/news/new_jersey/Pimp_Gucci_Prada_gets_life_for_forcing_child_into_prostitution.html (last visited Oct. 23, 2020).

multiple nights several times a year. The prostitution and sex trafficking activity described herein was apparent to, and seen by, these inspectors.

57.

Exemplifying its direct control and involvement in the security operations of its franchised hotels, in December 2019, Mr. Limbert and Greg Stocker, security director for RRI and/or RRF, traveled to Norcross, Georgia to attend a meeting with the Gwinnett County Solicitor General's office to "draft a plan for accountability and crime reduction at Red Roof Inn establishments" in Norcross.[9] The Red Roof hotels in Norcross were also franchised hotels. This further supports the inference that RRI and/or RRF controlled security at their franchised hotels, including the subject Atlanta Red Roof Inns. RRI and/or RRF would not send its legal counsel and head of security to Gwinnett County to address crime at hotels if it had no authority, ability, or control over security at its hotels.

58.

After Gwinnett County notified several hotels in Norcross about pervasive crime, some hotels immediately took steps to address crime at their hotels. The

[9] Karen Huppertz, *Gwinnett Meeting with Red Roof Inn Addresses Safety Concerns*, Atlanta Journal-Constitution, (Dec. 6, 2019) https://www.ajc.com/news/local/gwinnett-meeting-with-red-roof-inn-addresses-safety-concerns/MatpK9SzJ0CRKuAbgZKBmN/. (Last visited Oct. 23, 2020).

county stated, "Several hotel chains . . . are now in compliance. Further investigation into hotels, specifically the Red Roof Inn and its other brands inside the cities of Norcross and Suwanee, were determined to have unacceptably high crime rates."[10]

59.

Similar conduct continues at the Atlanta Red Roof Inns. As recently as October 2020, buyers have posted online regarding their commercial sexual exploits at the Atlanta Red Roof Inns.

60.

Defendants knew or should have known of the Tourism Child-Protection Code of Conduct (hereinafter "the Code") and negligently failed to implement appropriate steps to prevent child sex trafficking at the subject Atlanta Red Roof Inns, such as:

a) establishing corporate policies and procedures against sexual exploitation of children;

b) training employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

[10] *Id.*

c) including a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

d) providing information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

e) supporting, collaborating, and engaging stakeholders in the prevention of sexual exploitation of children; and

f) reporting annually on the company's implementation of Code-related activities.

61.

By no later than 2004, Defendants knew of the Code. Upon information and belief, Defendants RRI and/or RRF refused to sign it until 2019. Despite its knowledge of the Code, RRI and/or RRF negligently failed to appropriately follow and implement these basic sex trafficking prevention rules and guidelines at the Atlanta Red Roof Inns.

62.

Defendants negligently failed to train their employees, managers, agents, and franchisee hotel staff, including those at the Atlanta Red Roof Inns, on the

Department of Homeland Security ("DHS") guidelines to identify warning signs that indicate the presence of sex trafficking on the hotel premises, such as:

a) persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

b) persons who lack freedom of movement or are constantly monitored;

c) persons who have no control over or possession of money or ID;

d) persons who dress inappropriately for their age or have lower quality clothing compared to others in its party;

e) requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f) the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g) extended stay with few or no personal possessions in the room;

h) excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

i) the same person reserves multiple rooms;

j) a room is rented hourly, less than a day, or for an atypical extended stay;

k) attempts to sell items to or beg from patrons or staff;

l) cars in the parking lot regularly parked backward, so the license plates are not visible;

m) loitering and solicitation of male patrons;

n) waiting at a table or bar and picked up by a male (trafficker or customer);

o) persons asking staff or patrons for food or money; and

p) persons taking cash or receipts left on tables.

63.

The unusual amount of control and involvement in the day-to-day operations of the Atlanta Red Roof Inns created agency relationships between RRI and/or RRF and the Owners, and the Owners' employees and representatives.

64.

Based upon the factual assertions outlined in paragraphs 15–63 and throughout this Complaint, RRI and/or RRF are directly liable for their own acts, omissions, and negligence, and vicariously liable for the acts, omissions, and negligence of the Owners and the Owners' agents and employees, as discussed herein.

65.

Whenever reference is made in this Complaint to any act, deed, or conduct of RRI and/or RRF, the allegation is that RRI and/or RRF engaged in the acts, deeds, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of RRI and/or RRF.

**SEX TRAFFICKING & KEEPING A PLACE OF PROSTITUION**

66.

Defendants benefitted financially from participating in a venture that they knew or should have known violated the TVPRA, 18 U.S.C. § 1595(a).

67.

Unlike other businesses, hotels play a critical role in sex trafficking ventures. They are the venue of the crime, where the commercial sex happens, including, as in this case, with minors. Providing the venue—for money, facing risk—is direct participation in a sex trafficking venture. Defendants, for a fee, provided the crime scenes, private and anonymous venues for Plaintiff E.F. to be sold for sex at the subject Atlanta Red Roof Inns.

68.

Minor sex trafficking includes recruiting, enticing, harboring, transporting, obtaining, maintaining, patronizing, or soliciting a person for a commercial sex act who is under the age of 18. 18 U.S.C. § 1591(a), *et seq*. Plaintiff was a victim of minor sex trafficking at the Red Roof Airport North from 2007 through 2009 and at the Smyrna Red Roof in 2007.

69.

Sex trafficking includes recruiting, enticing, harboring, transporting, obtaining, maintaining, patronizing, or soliciting a person for a commercial sex act knowing or in reckless disregard of the fact that means of force, fraud, or coercion will be used to cause the person to engage in a commercial sex act. 18 U.S.C. § 1591(a), *et seq*. Plaintiff was a victim of sex trafficking at the Red Roof Airport North from 2007 through 2009, at the Smyrna Red Roof in 2007, at the Fulton Industrial Red Roof from 2013 through 2019, and at the Red Roof Airport South in 2019.

70.

Defendants knew or should have known of the existence of sex trafficking and its illegality since the passage of the Trafficking Victims Protection Act in

2000, and the United Nations' adoption of the Palermo Protocol, to prevent, suppress, and punish trafficking in persons.

71.

Defendants knew or should have known that Atlanta was a hub of sex trafficking and that the crime was prevalent in the city, including at RRI and/or RRF's hotels. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of, if not the, largest illegal sex trafficking economies in the country. In 2007, when Plaintiff was trafficked at two different Red Roof Inns in Atlanta, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average *weekly* earnings of roughly $33,000.[11]

72.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, and particularly child

---

[11] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, (March 13, 2014) https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited Oct. 23, 2020); *see also* Meredith Dank, et.al, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, (March 12 2014), 30-32, *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Oct. 23, 2020).

sex trafficking."[12] Defendants knew or should have known that Atlanta had been identified as "the number one city for child sex trafficking."[13]

73.

Hotels and motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

74.

Defendants received money for keeping a place of prostitution by exercising control over the subject Atlanta Red Roof Inns and knowingly permitting the use of each hotel for prostitution in violation of O.C.G.A. § 16-6-10 on more than on occasion. This constitutes racketeering activity under Georgia RICO. O.C.G.A. § 16-14-3(5)(A)(vii).

---

[12] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month, (Jan. 29, 2015), *available at* https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Oct. 23, 2020)

[13] *Id.*

75.

Through their actions training employees (or failing to) and operating the Atlanta Red Roof Inns, and through the actions of their employees, agents, and/or representatives, Defendants negligently breached duties imposed by Georgia law, assumed by contract, and voluntarily undertaken at the Atlanta Red Roof Inns. Defendants knew or should have known of the foreseeable risk of sex trafficking and prostitution at the Atlanta Red Roof Inns and failed to act as similarly situated businesses would in like circumstances.

## A. Plaintiff's minor sex trafficking at the Red Roof Airport North.

76.

Plaintiff was trafficked for sex at the Red Roof Airport North as a minor, where she was an invitee, on multiple visits from 2007 through 2009.

77.

RRI and/or RRF knew of, condoned, and permitted the widespread prostitution and should have known of the sex trafficking at the Red Roof Airport North, over which RRI and/or RRF exercised control.

78.

Hotel management and front desk staff at the hotel arranged with Plaintiff's trafficker to have sex with Plaintiff in her room at the Red Roof Airport North on multiple occasions.

79.

Employees at the Red Roof Airport North acted as lookouts for Plaintiff's sex trafficker and kept Plaintiff's sex trafficker informed of police activity at the hotel.

80.

The side doors of the Red Roof Airport North were allowed to stay propped open to allow the frequent buyers of commercial sex to more easily and quickly access victims for sex at the hotel, including Plaintiff.

81.

Plaintiff's sex trafficker operated openly and brazenly at the Red Roof Airport North, as did a number of other sex traffickers. When Plaintiff was trafficked at the Red Roof Airport North, she frequently witnessed more than 6 other traffickers operating at the hotel, each trafficking more than one victim at the hotel at a time. As a result, a large number of buyers frequented the hotel each day.

82.

While Plaintiff was trafficked at the Red Roof Airport North, as many as 15 older men visited the sex trafficker's rooms each day to purchase sex with the minor E.F., each staying for short periods of time. Defendants RRI and/or RRF knew or should have known that the number of daily, older male visitors to the room was obviously indicative of not only prostitution, but also of minor sex trafficking, and RRI and/or RRF negligently failed to control or monitor the frequent male visitors.

83.

Plaintiff was beaten by her trafficker at the Red Roof Airport North. Staff at the hotel saw the visible signs of Plaintiff's beatings as the minor was being trafficked at the hotel.

84.

Tragically, Plaintiff was not the only minor trafficking victim at the Red Roof Airport North. From 2007 through 2009, Plaintiff's sister—also a minor—was trafficked with her, beginning at the age of 13. Both sisters were at times trafficked in the same room, in different rooms, and each exhibited similar signs of victimization, and also had a number of daily male buyers who visited the same room.

85.

Plaintiff and other trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing. Hotel staff saw the girls and their inappropriate and victimized appearance and knew or should have known Plaintiff was a minor victim of sex trafficking occurring at the Red Roof Inn.

86.

While she was trafficked at the Red Roof Airport North, Plaintiff exhibited numerous well-known and visible signs of a minor sex trafficking victim in the common areas, of which RRI and/or RRF knew or should have known, including her age and inappropriate appearance, physical deterioration, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, no control of or possession of money, loitering, soliciting male patrons, and monitoring and control by her traffickers, older men.

87.

While she was trafficked at the Red Roof Airport North, Plaintiff’s rooms evidenced numerous well-known and visible signs of sex trafficking of which RRI and/or RRF knew or should have known. Frequently, the trash cans in the rooms in which Plaintiff was trafficked contained an extraordinary number of used

condoms, the rooms contained multiple cell phones, and Plaintiff frequently requested an excessive amount of towels from housekeeping.

88.

Pursuant to RRI and/or RRF's systems, standards and the applicable Franchisor Contracts, RRI and/or RRF executives regularly performed unannounced and sometimes anonymous inspections of the Red Roof Airport North property, operations, and records to ensure the property was maintained according to RRI's and/or RRF's standards. The minor sex trafficking activity at the Red Roof Airport North was apparent to RRI's and/or RRF's inspectors.

89.

RRI and/or RRF received a number of internal complaints regarding prostitution and a lack of security at the hotel while Plaintiff was trafficked at the Red Roof Airport North. RRI and/or RRF filed a small number of these complaints in the aforementioned bankruptcy case, including:

a. On December 9, 2008, a guest reported:

> The worst I have ever had. There was a prostitute waiting in the lobby [with her] pimp to start the visit. The hotel was filthy. The manager on duty who helped us at the counter to checkin [knew] the prostitute and gang waiting in the lobby. He was not helpful. I asked him if he could tell me what end of the hotel [our] room was so we [knew] which end to park and he responded I don't know. We were kept up the entire evening by the room right above us. I am assuming the prostitute took the

> room above us and was in service the entire night. The smell in the hallways was unbearable. I have never had such a miserable experience at a hotel/motel. I did not feel safe in this facility[.].

b. On December 9, 2008, a guest reported:

> The door latches and phones of two different rooms she was assigned were broken or removed entirely. "She said it is unsafe to have locks & phones that do not work & the filth on top of that was ridiculous. She said she will never stay with RRI again. She also stated no one seemed too concerned and didn't even offer a discount."

c. In May 2009, multiple guests reported broken locks on their rooms at the Red Roof Airport North.

d. On June 10, 2009, a guest reported,

> My biggest complaint involves a security issues . . . a group of teenagers running in the hall outside my room . . . was not concerned until the door to my room began to open. I had to put up the second security lock on . . . I realize this is at best a deterrent to a determined forceful entry."

90.

RRI and/or RRF knew or should have known of other complaints received internally, publicly available online reviews, and/or online information that reported widespread prostitution and other crimes at the hotel, as well as other crimes occurring on their premises and approaches prior to Plaintiff's sex trafficking.

91.

RRI and/or RRF requires the owner of the Red Roof Airport North, like all Red Roof Inns, to send all safety and security reports, including crime and incident reports, directly to RRI and/or RRF. RRI and/or RRF knew or should have known of hundreds of incidents, including prostitution, rape, and other sex crimes, that occurred at the hotel before and during Plaintiff's sex trafficking at the Red Roof Airport North.

92.

As a direct and proximate result of RRI's and/or RRF's acts and omissions, Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

**B. Plaintiff's minor sex trafficking at the Smyrna Red Roof.**

93.

Plaintiff was trafficked for sex (as a 14-15 year old minor) at the Smyrna Red Roof, where she was an invitee, on multiple visits in 2007.

94.

Several RRI and/or RRF employees routinely assisted sex traffickers, including minor sex traffickers, at the Smyrna Red Roof and acted as lookouts for the sex traffickers, alerting them to the presence of police at the hotel and assisting

them to evade detection by the police, so as to keep the sex trafficking ventures at the Smyrna Red Roof in operation.

95.

RRI and/or RRF knew of, condoned, and permitted the widespread prostitution and should have known of sex trafficking at the Smyrna Red Roof. During the relevant time period, RRI and/or RRF operated the Smyrna Red Roof. All employees of the Smyrna Red Roof worked directly for RRI and/or RRF at the time.

96.

Plaintiff and other trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing. Hotel staff saw the girls and their inappropriate and victimized appearance and knew or should have known Plaintiff was a minor victim of sex trafficking occurring at the Smyrna Red Roof Inn.

97.

Sex trafficking and prostitution at the Smyrna Red Roof was open and obvious. Plaintiff witnessed that the hotel permitted women and minor girls, including herself, to stand partially nude or nude in the doorways of rooms at the

hotel so that buyers driving though the parking lot could observe the numerous women being sold for commercial sex and choose which one they preferred.

98.

This fact is confirmed by other RRI and/or RRF employees who have stated that "women who were trafficked at the hotel hung over the balconies and waited on customers outside their rooms."

99.

Plaintiff was visible to RRI and/or RRF and its direct employees while she stood partially nude in doorways as an advertisement to buyers of commercial sex at the Smyrna Red Roof. RRI and/or RRF and its employees had the opportunity to, and did, observe Plaintiff and thereby knew she was a minor.

100.

An RRI and/or RRF employee near the time when Plaintiff was trafficked has stated that there were many minors being sold for sex at the Smyrna Red Roof, stating that "[s]ome girls being trafficked at the Red Roof Inn were clearly and noticeably under the age of 18."

101.

A general manager for the Smyrna Red Roof in 2009 has stated that the general manager before her, who was the general manager when Plaintiff was trafficked there, “had a reputation for turning a blind eye to criminal activity occurring at the hotel” and also had a reputation for acting as a lookout for traffickers at the hotel.

102.

While Plaintiff was trafficked at the Smyrna Red Roof, numerous older men visited the sex trafficker’s rooms each day, each for short periods of time. RRI and/or RRF knew or should have known that the number of daily, older male visitors to the room was obviously indicative of not only prostitution, but also of minor sex trafficking, and RRI and/or RRF negligently failed to control or monitor the frequent male visitors.

103.

While she was trafficked at the Smyrna Red Roof, Plaintiff exhibited numerous well-known and visible signs of a minor sex trafficking victim in the common areas, of which RRI and/or RRF knew or should have known, including her age and inappropriate appearance, physical deterioration, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, no control of

or possession of money, loitering, soliciting male patrons, and monitoring and control by her trafficker, an older man.

104.

While she was trafficked at the Smyrna Red Roof, Plaintiff's rooms evidenced numerous well-known and visible signs of sex trafficking of which RRI and/or RRF knew or should have known. Frequently, the trash cans in the rooms in which Plaintiff was trafficked contained an extraordinary number of used condoms, the rooms contained multiple cell phones, and Plaintiff frequently requested an excessive amount of towels from housekeeping.

105.

On information and belief, RRI and/or RRF knew or should have known of publicly available online reviews, online information, and police reports that reported widespread prostitution and other crimes at the hotel, as well as other crimes occurring on their premises and approaches prior to Plaintiff's sex trafficking.

106.

On information and belief, RRI and/or RRF received a number of complaints regarding crime and a lack of security at the hotel prior to and while Plaintiff was trafficked at the Smyrna Red Roof.

107.

Further evidence after Plaintiff was trafficked at the Smyrna Red Roof, in addition to paragraphs 40–54 above, supports the inference that RRI and/or RRF permitted prostitution and sex trafficking at the Smyrna Red Roof.

108.

Smyrna Red Roof employees have stated that at times, in the years between 2008 and 2016, *more than half* of the Smyrna Red Roof's business came from sex traffickers and prostitutes renting hotel rooms.

109.

An RRI and/or RRF employee who began work at the hotel in 2008 has stated that "on an average night" at the hotel there were usually 10–12 different pimps staying at the Smyrna Red Roof at the same time, with some traffickers controlling 4–5 victims at a time at the hotel and that the employees knew there were often more than 100 buyers visiting the hotel for commercial sex *each day*. This employee stated that commercial sex buyers were present regardless of the time of day and witnessed sex traffickers in the parking lot of the hotel directing the cars of buyers into more orderly lines so that buyers could come and go quickly without getting stuck in the busy parking lot and, as a result, reducing revenue. Hotel employees saw traffickers openly beat victims in the public parking lot.

110.

The Smyrna Red Roof did not attempt to disguise the bustling sex trade taking place on its property. Instead, it prominently displayed a sign at the front desk and night window reading: "NO REFUNDS AFTER 15 MINUTES."







111.

The "NO REFUNDS AFTER 15 MINUTES" sign was posted for many years, from 2012 until 2019, and also featured prominently in numerous publicly available online reviews and would have been obvious to anyone on-site, including those charged with auditing and inspecting the property on behalf of RRI and/or RRF.

112.

RRI and/or RRF knew of the "NO REFUNDS" sign and was aware of the reasons for it—the steady flow of sex buyers coming to the property for brief visits.

113.

Additionally, a RRI and/or RRF employee observed that the sex trafficking ventures operating at the Smyrna Red Roof tried to control the commercial sex business there. For example, the RRI and/or RRF employee noticed that any prostitute that tried to work independently—without a trafficker—was either chased off the property by traffickers or was forced to work for them.

114.

Despite the rampant sex trafficking and prostitution, and many severe incidents of violence, including attempted murder, a former RRI and/or RRF employee has stated employees never received any safety or security training from their direct employer, RRI and/or RRF, at that time and confirmed that nothing was done to address security concerns after these violent criminal incidents.

115.

In addition to ATLTrafficking website referenced above, "Red Roofie Blog," begun in 2014, also warned of drug activity and prostitution at the Smyrna Red Roof and warned travelers (especially families) not to stay at the hotel.[14]

116.

RRI and/or RRF did not take steps to stop profiting from the prostitution and sex trafficking at the Smyrna Red Roof after these websites published information about the hotel and after RRI and/or RRF's CEO was informed of sex trafficking at the hotel. This is evidenced in part by multiple other lawsuits brought by sex trafficking victims against the Smyrna Red Roof.

117.

In addition to the direct knowledge of RRI and/or RRF's highest executives, the conditions at the Smyrna Red Roof were obvious to anyone, including the other RRI and/or RRF employees and agents who visited the property during the time Plaintiffs were trafficked there.

[14] Red Roofie Blog: Avoid Red Roof Inn Smyrna Georgia. http://redroofie.blogspot.com/p/reviews.html (last visited Oct 23, 2020).

118.

Jay Moyer, Vice President of Operations for RRI and/or RRF, regularly visited the Smyrna Red Roof to inspect the hotel and discuss the hotel's revenue and performance. He frequently stayed for 2–3 nights, several times each year. The trafficking activity described above was rampant and known to Mr. Moyer—who eventually refused to stay overnight at the hotel because of it.

119.

Sometime in 2011–2012, Cobb County police notified the then-general manager of the Smyrna Red Roof that sex traffickers had paid a former general manager and a then-current employee to act as "lookouts." The employee continued working at the hotel for six more months.

120.

One well-known prostitute was a permanent resident at the Smyrna Red Roof Inn and frequently had buyers come to her room for commercial sex acts.

121.

Numerous arrests and investigations continued to provide RRI and/or RRF with notice of sex trafficking and prostitution ventures and operating at the Smyrna Red Roof.

a) A December 2010 prostitution sting conducted by the Metro Atlanta Child Exploitation Task Force and the Marietta Police Department, during which law enforcement rescued a 16-year-old trafficking victim and an 18-year-old was arrested on prostitution charges;[15]

b) March 2011 Cobb County Police arrest reports noted that the "location is known for problems with drugs and prostitution" and was a "hotbed of illegal activities";

c) A July 2011 report of theft at the hotel, in which the victim reported that "a pimp and a prostitute" stole her property "because she refused to work for [the pimp]";

d) On April 18, 2012, police responded to a dispute at the Smyrna Red Roof between a guest and a Smyrna Red Roof employee. The guest demanded his money back from the Smyrna Red Roof Inn for, among other things, being "harassed by prostitutes." The hotel refused;

e) On June 28, 2012, a woman called the police after performing commercial sex acts for two buyers and another woman named

"Daisy" stole the money and left the woman stranded at the Smyrna Red Roof;

f) On March 6, 2013, a 19-year-old woman was arrested at the Smyrna Red Roof for prostitution and drugs. Cobb County Police reported the operation was "in reference to complaints of suspected prostitution occurring in the area. These complaints were being reported by business owners, patrol officers working the area and the general public.";

g) In December 2014, a man was arrested for buying sex from a 16-year old trafficking victim and then grabbing the girl by her hair, dragging her to the room's bathroom, and attempting to drown her in the bathtub.[16] Police officers battered down the door to rescue the girl, but no training or additional security measures were implemented by the hotel after this incident;

h) On January 1, 2015, police arrested James Roche for pimping and keeping a place of prostitution at the Smyrna Red Roof after beating a victim of sex trafficking so badly that she could no longer move;

i) On August 27, 2015, police found a woman at the Smyrna Red Roof who called to report that her pimp beat her up at the hotel;

j) On December 27, 2015, a man called to report that he was meeting a woman whose advertisement he found on backpage.com at the Smyrna Red Roof "not for sex" and then his money was stolen by a group of men waiting outside the room; and

k) On October 1, 2017, police rescued a woman from the Smyrna Red Roof who had been kidnapped and forced into prostitution and held against her will for four days inside the Smyrna Red Roof;

122.

RRI and/or RRF requires the owner of the Smyrna Red Roof, like all Red Roof Inns, to send all safety and security reports, including crime and incident reports such as the above, directly to RRI and/or RRF. RRI and/or RRF knew or should have known of these incidents and others that occurred at the hotel before and during Plaintiff's sex trafficking at the Smyrna Red Roof.

123.

Online reviews also continued to provide RRI and/or RRF with actual or constructive knowledge of prostitution and the foreseeable risk of sex trafficking ventures at the Smyrna Red Roof.

124.

Publicly available online reviews of the Smyrna Red Roof reporting widespread prostitution and crime at the hotel included:[17]

l) A July 7, 2013 review, stating:

> **Prostitutes everywhere** . . . . There were prostitutes at a couple doors too. Around midnight we heard loud yelling and looked out our window. Seven (yes seven!) cop cars were directly in front of our room and were arresting someone as a prostitute stood 5 feet from our window. It was hard to sleep to say the least. The only security I felt was the fact our dog was with us. Don't stay here!!!

m) An August 12, 2014 review, stating:

> **PROSTITUTION – COCK ROACHES – AND DOG POOP!** Deluxe ROOM
> DO NOT GO THERE!!!!! My worst experience ever! Saw prostitution, dogs pooping outside, loitering, dead cockroaches in my room. I askd thm 2 come get it up th clerk said he could "bring me a broom!"[] NOT! . . . I wouldn't send my enemy here! Unless you want crackheads and prostitutes and don't mind . . . .
>
> In response, Mr. Patel wrote:
>
> > I am writing deep apology for prostitution came in our property. I just hire new security person for watch night for any one who make any kind of problem.this will not happen again.

n) An August 2014 review, stating,

[17] Emphasis, where present, is added.

> This hotel is unsanitary and a hotbed for criminal activity. . . . Dirty pillow cases, **blood on the floor**, bugs, cigarette burns everywhere, **prostitutes, and drug activity right outside our door**, which had no lock because apparently it had been kicked in by the police. The desk clerk couldn't have cared less.

Mr. Patel responded to this review.

o) A September 2014 review, stating,

> I am in the room right now scared! . . . I watched as a young girl did the 2 fingers to her eyes and a point to guy across to other building only to push him a min later and say"10 dollars? Im a dime baby you no im worth more than that!" Then the traffic throughout the day.... **its a drug and prostitute headquarters**. Im a young male well over 6ft tall and fear for my safety! I smoke cigarettes religiously and have quit and made a promise to never do it again because I had to stand outside and witness these acts and wonder if I would be jumped! [. . .] oh and now I hear shamika making a quick buck in the next room, classy! The roof is red and so are the sheets! [. . .] Im starving from the thc in the air, [. . .] Just waiting for the gun fire as I already planned my emergency plan over and over in my head! [. . .] wish me the best in the next hour as I use all my strength to grab all my bags and run for the truck, I did not sign up for this!

Mr. Patel responded to this review.

p) A September 7, 2014 review, stating,

> **Nothing but a dope and prostitution den!!** The room was nasty. . . . Kind of scary with men hanging out in lobby while checking in. The parking lot was filled with young people drinking and smoking dope. I believe it should be condemned! Avoid at all costs. You would be better off sleeping in your car.

Mr. Patel responded to this review.

q) A July 2015 review, stating,

> Bed bugs crawling on top of the bedding, **prostitutes roaming the facility, drug deals taking place in the walkways,** loitering in the office people sitting . . . unsavory characters every where [sic], not recommended for anyone. If it were possible to give less than 1 star I would needless to say, this review was captured in less than 15 minutes at the establishment. BEWARE!!

Mr. Patel responded to this review.

r) An August 2015 review, stating,

> DO NOT STAY HERE. Terrible place to stay. [. . .] **Prostitutes and drug dealers roam the parking lot.** There are at least 5 people on the parking lot all hours of the night..

Mr. Patel responded to this review.

s) An August 8, 2015 review, stating,

> DO NOT stay here! . . . **There were shady people hanging out outside of our room door at all hours of the night and there was open prostitution occurring on the property**. **There are at least 5 people on the parking lot all hours of the night**.

Mr. Patel responded and apologized that "people wear [sic] hanging out in the hallway" and said, "I will hire security man for night. i will make sure it will not happen again."

t) An August 2015 review, stating,

> Ok so I get there, she tells me system down I seen people just hanging out in lobby. Just sitting smelled really funny,

> housekeepers steal and look real shady. Needs more cameras **lots of prostitution going on and I know the staff know.** ***They will call peoples room when the police come and say don't answer*****. I seen this happen to me** . . . . This hotel is a trap spot for $60 do not put your life at risk! BaD AREA!!!!!!

Mr. Patel responded to this review.

u) A September 2015 review, stating,

> I recently stayed here . . . I was approached from 2 officers informing us that we needed to place all our belongings inside and lock our vehicles because **this is a high drug area & prostitution area.**

Mr. Patel responded to this review.

v) A May 17, 2016 review, stating:

> Ok to start do not stay here. . . . **There were drug dealers (fake thugs), prostitution, and for two days straight there were police leaving the premises.** … The 1st day of me checking in I found blood on the bathroom door, walls and floor.

125.

RRI and/or RRF monitored the reviews of the Smyrna Red Roof, including but not limited to Tripadvisor reviews, and required the location manager to respond to certain reviews, and used the reviews in its performance metrics. As a result, RRI and/or RRF knew or should have known of these reviews, the prevalence of crime and prostitution and other indicia of sex trafficking at the Smyrna Red Roof. Furthermore, as part of its supervision and control of the

Smyrna Red Roof, if the manager's resolution is not satisfactory to RRI and/or RRF, RRI and/or RRF will fine the location manager.

126.

RRI and/or RRF employees monitor each hotel. For the Smyrna Red Roof, those employees included Mr. Moyer, a Vice President of Operations, and Vickie Lam.

127.

On behalf of RRI and/or RRF, Mr. Moyer, Ms. Lam, and others monitored the revenue, occupancy, online reviews, and physical premises of the Smyrna Red Roof.

128.

RRI and/or RRF employees routinely contacted the employees at the Smyrna Red Roof regarding specific negative online reviews in response to customer complaints.

129.

At one point, a general manager of the Smyrna Red Roof began making more frequent calls to the police and refused to rent rooms to people who appeared to be engaged in suspicious or illegal activity.

130.

In response, Mr. Moyer told her “you need to sell rooms” and “you need to get your numbers up.”

131.

The Smyrna Red Roof security guards frequently hung out with guests who were “partying” outside their rooms, engaging in some of the same activity.

132.

One security employee told one of the Smyrna Red Roof managers that other managers encouraged this type of behavior.

133.

This ineffective security was common during both RRI and/or RRF’s operation of the hotel without a franchisee, and after a franchisee was involved.

134.

RRI and/or RRF’s control and operation of the Smyrna Red Roof while Plaintiff was trafficked there as a minor is actionable under Georgia law due to Plaintiff’s disability and further evidence of RRI and/or RRF’s actual and

constructive knowledge of prostitution, sex trafficking, and minor sex trafficking at the Atlanta Red Roof Inns.[18]

135.

As a direct and proximate result of RRI and/or RRF's acts and omissions, Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

**D. Plaintiff's sex trafficking at the Fulton Industrial Red Roof**

136.

The Fulton Industrial Boulevard area, where the Fulton Industrial Red Roof is located, is a well-known and notorious area for prostitution and sex trafficking in Atlanta.[19]

---

[18] Should evidence obtained in discovery warrant, Plaintiff may assert claims based on conduct at the Smyrna Red Roof in 2007 under the "perpetrator" standard in effect at the time under 18 U.S.C. § 1595(a). Any such claims would relate back to the date of filing this Complaint.

[19] *See, e.g.*, Meredith Dank, et.al, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, (March 12 2014) (Noting that "street-level prostitution . . . occurs along specific tracks within more densely urban areas, particularly the Fulton Industrial area."), 123, *available at* https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Oct. 21, 2020); Aaron Diamant, *Loophole Helps Cheap Hotels Serve as Save Havens for Violent Crime,* WSB-TV 2, (May 20, 2016) https://www.wsbtv.com/news/2-investigates/loophole-lets-cheap-hotels-serve-as-safe-havens-for-prostitutes-pimps-and-drug-dealers/292230950/. (Last visited Oct. 23, 2020)

137.

Plaintiff was trafficked for sex at the Fulton Industrial Red Roof, where she was an invitee, on multiple visits from 2013 through 2019. Defendant RRF was the Franchisor of the motel during this time period. Defendant Sai National Hospitality Ventures, LLC (Sai) was the franchisee of this property in 2018 and 2019.

138.

Plaintiff's sex trafficker operated openly and brazenly at the Fulton Industrial Red Roof, as did a number of other sex traffickers. When Plaintiff was trafficked at the Fulton Industrial Red Roof, prostitution was rampant. Plaintiff has witnessed as many as 15 traffickers at the hotel at one time, several living at the hotel. Each controlled one or more sex trafficking victims. As a result, a very large number of buyers frequented the hotel each day.

139.

Defendants RRI and/or RRF and Sai knew of, condoned, and permitted the widespread prostitution and sex trafficking at the Fulton Industrial Red Roof Inn, over which they jointly exercised control.

140.

Employees at the Fulton Industrial Red Roof acted as lookouts for Plaintiff's sex trafficker and kept Plaintiff's sex trafficker informed of police activity at the hotel.

141.

While Plaintiff was trafficked at the Fulton Industrial Red Roof, between 10 and 15 older men visited the sex trafficker's rooms each day, each for short periods of time. Defendants RRI and/or RRF and Sai knew or should have known that the number of daily, older male visitors to the room was obviously indicative of not only prostitution, but also of minor sex trafficking, and Defendants RRI and/or RRF and Sai negligently failed to control or monitor the frequent male visitors.

142.

Plaintiff and other trafficking victims frequently appeared throughout the hotel and on the hotel premises and approaches wearing very little clothing. Hotel staff saw the girls and their inappropriate and victimized appearance and knew or should have known Plaintiff was a victim of sex trafficking occurring at the hotel.

143.

Once, in the lobby of the Fulton Industrial Red Roof, a buyer got in a loud argument with Plaintiff, demanding his money back, and calling Plaintiff a "bitch"

and a “hoe.” Hotel staff who were present saw and heard the argument, but did nothing to intervene.

144.

Plaintiff was frequently beaten by her trafficker at the Fulton Industrial Red Roof. On one occasion, Plaintiff’s trafficker grabbed Plaintiff and hit her in the face in the hotel lobby. Hotel staff saw Plaintiff being beaten by her trafficker, but did nothing to help due to their longstanding relationship with Plaintiff’s trafficker.

145.

Prostitution is so rampant at the Fulton Industrial Red Roof location that police have noted the practice of prostitutes waving at drivers from the roadway and then escorting them into the hotel for commercial sex. RRI and/or RRF and Sai knew or should have known of this practice.

146.

While she was trafficked at the Fulton Industrial Red Roof, Plaintiff exhibited numerous well-known and visible signs of a minor sex trafficking victim in the common areas, of which RRI and/or RRF and Defendant Sai knew or should have known, including her age and inappropriate appearance, physical deterioration, poor hygiene, fatigue, sleep deprivation, injuries, a failure to make

eye contact with others, no control of or possession of money, loitering, soliciting male patrons, and monitoring and control by her traffickers, older men.

147.

While she was trafficked at the Fulton Industrial Red Roof, Plaintiff's rooms evidenced numerous well-known and visible signs of sex trafficking of which RRI and/or RRF and Sai knew or should have known. Frequently, the trash cans in the rooms in which Plaintiff was trafficked contained an extraordinary number of used condoms, the rooms contained multiple cell phones, and Plaintiff frequently requested an excessive amount of towels from housekeeping.

148.

Pursuant to RRI and/or RRF's system standards and the applicable Franchisor Contracts, RRI and/or RRF executives regularly performed unannounced and sometimes anonymous inspections of the Fulton Industrial Red Roof property, operations, and records to ensure the property was maintained according to RRI and/or RRF standards. The sex trafficking activity and prostitution at the Fulton Industrial Red Roof was apparent to RRI and/or RRF inspectors.

149.

On information and belief, Defendants RRI and/or RRF and Sai received a number of internal complaints regarding crime and a lack of security at the hotel while Plaintiff was trafficked at the Fulton Industrial Red Roof.

150.

Defendants RRI and/or RRF and Sai knew or should have known about sex trafficking and knew of prostitution at the Fulton Industrial Red Roof because it was a continuous presence in that motel for years before the building became a Red Roof Inn.

151.

Plaintiff was trafficked for sex in this building as a minor, from the time she was 15 in 2007, until as recently as 2019. Plaintiff was trafficked for sex in this building on scores of separate visits when the building was branded as other hotels. Plaintiff's trafficking in this building was a constant fact of her life from 2007 through 2019. RRI and/or RRF and Sai knew or should have known of the longstanding history of sex trafficking and prostitution at the hotel.

152.

A former owner, DILA, and its principal, Ms. Zaver, knew or should have known about the sex trafficking and prostitution at the Fulton Industrial Red Roof

because Ms. Zaver and her husband were part of the company that owned the building for several years before they contacted RRI to convert the hotel into a Red Roof Inn.

153.

When DILA bought the property from the prior owner, the Fulton County Department of Health refused to issue a permit to DILA because the number of criminal incidents at the hotel were determined to be extremely high. DILA and Ms. Zaver sued the county to reopen as a Red Roof Inn, asserting that the hotel would be a safe hotel in part *because it would be a Red Roof Inn.*

154.

In widely-reported meetings regarding the permit issue, county officials noted the decrease in prostitution in the area since the hotel had closed and the hotel's "negative impact on the legitimate businesses in the area." A county commissioner asked supporters of opening the hotel, "Where were you when the prostitutes and pimps were running the street and people were renting rooms by the day?[20]

[20] Craig Lucie, *Business Owners Say Permit Denial for Hotel More About Race Than Crime*, WSB-TV, (Sept. 4, 2013), https://www.wsbtv.com/news/local/business-owners-say-permit-denial-hotel-more-about/242967308/. (Last visited Oct. 23, 2020).

155.

Testimony at the subsequent hearing by Captain Wade Yates showed that there were 343 911 emergency calls to the property in 2010, 337 in 2011, 188 in 2012. By April 2013, there had been 61 emergency calls to the hotel, in spite of the fact that the hotel had been closed since February.[21]

156.

Kevin Jones, department director for environmental health services for Fulton County, testified in the hearing that the permit for the Fulton Industrial Red Roof was denied because there had been over 300 calls for service at the hotel. He stated, “Of those 300 calls for service, 100 of those calls consisted of things such as sexual assault, hold up, larceny, public indecency, discharging firearms, removing stolen goods, a person stabbed and shot.”[22]

157.

At the hearing, public safety manager of the Community Improvement District, Frank Mazzilli, testified about the hotel: “[T]here was obviously a lot of activity around that particular hotel and the convenience store across the street from the hotel on the—that would be on the west side of Fulton Industrial

[21] Hearing Transcript, 110:14-25.
[22] *Id.* at 147:6-10.

Boulevard. It was always ladies which appeared to be prostitutes. I seen by my experience what were drug dealers that were congregating in the area in and around the hotel."[23]

158.

Mr. Mazzilli observed the hotel area after the Fulton Industrial Red Roof was closed by the permit denial and was asked the following:[24]

> **Q Have you observed similar activity on the property since it hasn't been in operation?**
>
> A It's been dramatically reduced. On the property itself I have not seen the same -- I haven't seen what appeared to be prostitutes or drug dealers on the property.

[23] *Id.* At 128:19-25, 129:1.
[24] *Id.* at 129:16-21.

159.

Mr. Mazzilli further testified as to Ms. Zaver's involvement with the Fulton Industrial Red Roof and her reputation in the area from her involvement with the hotel before it became a Red Roof Inn:[25]

**Q Is there any reason why you wouldn't have reached out to Ms. Zaver first?**

A I consider Ms. Zaver as part of the problem with crime in the area. I did not want to interact with her.

**Q Did what did you base that on, on Ms. Zaver personally being involved with crime. You accused her now. How was she involved with the crime?**

A You asked me a question. I responded.

**Q I understand. I'm asking you back: How is it that she is involved with crime? You mentioned her name specifically.**

A By talking to the business owners. They said that she was proprietor of the hotel, and it appeared that she was complicit with the crime that was occurring on the grounds.

25 *Id.* at 131:6-21.

160.

Ms. Zaver testified that the new Fulton Industrial Red Roof would not be a haven for crime and prostitution. At the hearing, she testified that "We can maintain security."[26]

161.

Defendants RRI and/or RRF and Sai knew or should have known about the extremely high crime at the location of the Fulton Industrial Red Roof, and the widely-reported lawsuit and hearing held to determine whether Fulton County would allow the hotel to operate. Defendants RRI and/or RRF carefully inspect and investigate each new potential Red Roof property and franchisee.

162.

Defendants RRI and/or RRF and Sai had actual or constructive knowledge of publicly available online reviews of the Fulton Industrial Red Roof reporting widespread prostitution and crime occurring at the hotel. RRI represents that "our president receives all of our TripAdvisor reviews to his email daily."

163.

Defendants RRI and/or RRF and Sai knew or should have known of the following publicly-available online reviews of the Fulton Industrial Red Roof:

[26] *Id.* at 49:16-17.

A 2015 review stating:

> DON'T STAY HERE!!! This is not a safe location. **There are hookers and crack heads all over the place…** Don't risk your vehicle or your life staying in this location.

A 2015 review stating:

> **When the sun goes down, there's a drug dealer and prostitute that work the corner behind the hotel. I was told by the front desk if I leave at night, have somebody go with me…** I stayed here back in July '15.

A 2015 review stating:

> DON'T STAY HERE!!! This is not a safe location. **There are hookers and crack heads all over the place…** Don't risk your vehicle or your life staying in this location.

A 2016 review stating:

> Not in a good area... **hookers, pimps, drug deals,** pot smell in and out of the establishment…

A 2016 review stating:

> I had the worst experience there… **gang bangers hanging out all day and night in the parking lot selling drugs and asking guests for money…** I do not recommend any body stay there everrrrr

A 2016 review stating:

> **There are prostitutes in the corner of the hotel and its Behind two nude nightclubs.** Not a place for a family to stay!!!!

A 2016 review stating:

> This is the worst hotel that I have ever stayed in…. **At night there were more men and prostitutes outside. We were so scared to get out of the car in fear that we would get snatched (for human trafficking_** I literally fear for my life. This was a trap house. This place really needs to be shut down.

A 2016 review stating:

> **The property was surrounded by prostitutes,** trash talking men loitering in the tiny lobby and right out front of the motel…

A 2016 review stating:

> Dirty Drug addicts, drug addicts, **prostitutes, surround the hotel** [don't] stay here.

A 2016 review stating:

> Do NOT stay here unless **you live a lifestyle of drugs and hookers.** It's next to a strip club… It is not safe for nor family friendly. Very misleading as a "six flags" hotel.

A 2018 review stating:

> Jesus Christ Lord have mercy… **hookers and drug dealers all over the place,** strip clubs across the street… NEVER NEVER NEVER will I even consider staying there. STRAIGHT GHETTO.

A 2018 review stating:

> I walked in and service was great. Smelled like dank though… **Walk in while hookers are walking out. This hotel is next to 2 clubs…** Would not recommend.

A 2018 review stating:

> Bad service… **neighbors have sex and bang on the walls all night,**

> **drugs on the floor marijuana being smoked throughout the place and worst of all prostitutes walk up to adults and kids.** Please if you wanna keep your sanity don't stay in this trash heap…

A 2018 review stating:

> Absolutely the worst experience ever. **There are drug dealers and prostitutes as soon as u get to the hotel…** Never Again!!!!

A 2018 review stating:

> DO NOT BOOK HERE… **DRUGS, PROSTITUTION, S**MELL OF URINE, & WINDOWS CRACKED OPEN!... COPS AND SECURITY ON SITE DESPITE EVERYTHING GOING ON. BAD SIDE OF TOWN. STAY AWAY!!!!

A 2018 review stating:

> **Approached by a prostitute before I made it to the front door…** Drug addicts milling about… This is a very dark place and not well run..

A 2019 review stating:

> **Very bad neighbor Hood lots of prostitute in very dark back of hotel.**

A 2019 review stating:

> We had to ask for towels, soap, the outside smell of urine outside, **and a lot of prostitutes soliciting.** This was not a good experience.

A 2019 review stating:

> Horrible! Ghetto, **drug dealing, prostitutes with horrible customer service, dirty, bad area!** Don't go here.

A 2019 review stating:

> **Drug dealers and hookers in the parking lot** and room was not fully cleaned.

A 2019 review stating:

> This was the worst hotel experience I've ever encountered… **Prostitution was a problem…** The manager was rude and condescending.

A 2019 review stating:

> First off as far as I can tell there's only one door in and out of the place… **Tone night I couldn't go to sleep because the guy next-door was clearly a pimp yelling at one of his girls.**

A 2019 review stating:

> **The crack hookers ruined it for us.** You should be ashamed to have a property like that on Expedia.

A 2019 review stating:

> Do your homework, **adult bars on both sides. Hooker hangout is what this place is.**

A 2019 review stating:

> Stay away. Do not bring your children here… **Inside and out was filled with drug dealers and prostitutes.** There was a homeless family sleeping in the waiting area of the lobby… However this is something my child will never forget.

A 2019 review stating:

> WORST PLACE EVER,… **DO YOURSELF AND YOUR FAMILY A FAVOR AND STAY FAR AWAY HOOKERS AND DRUG DEALERS PATROL THE AREA LITERALLY.**

A 2019 review stating:

> Wasn't happy with the establishment…**hookers at the door.**

A 2019 review stating:

> I would never stay in God for Saking sanking to the bottom of stans balls of a motel again! **Not only isn't it safe but its fearking prostitutes everywhere and everyone seems to be on drugs….** DISRESPECTFUL.

A 2020 review stating:

> **There was prostitutes in front of the property** – some of the rooms looked abandon from the outside…

A 2020 review stating:

> **Location was surrounded by prostitutes daily. The halls smelled of incense and marijuana.**

164.

The Fulton Industrial Red Roof RRI and/or RRF and Sai knew or should have known of other crimes, including prostitution and sex trafficking, at the hotel prior to Plaintiff being trafficked for sex at the Fulton Industrial Red Roof Inn. Specifically, and based on publicly available information and police reports, RRI

and/or RRF and Sai knew or should have known of the following crimes, among others, occurring on their premises and approaches:

a. In June 2012, an officer charged a prostitute with loitering after seeing three female prostitutes on the curb outside the hotel and two of them evaded the officer by entering the hotel.

b. In July 2012, a truck driver reported to police that he was solicited by a trafficker to have sex with a female prostitute controlled by the trafficker. The man rented a room in the hotel and did. The next morning his truck was reported stolen.

c. In September 2012, officers responded to a call by a woman at the hotel reporting that a prostitute at the hotel had left her baby with the woman and not returned.

d. In January 2013, police arrested a man for punching a woman in the face at the hotel. The woman told police the man who beat her was her pimp.

e. In February 2013, police arrested an active felon at the hotel after observing a prostitute flag the man down from the side of the road and lead him to the hotel parking lot. This is a common occurrence in the area. The officer reported, “Based on my knowledge and experience,

prostitutes that frequent the area stand in the roadway and attempt to flag down vehicles in an attempt to find a 'John.'"

f. In August 2013, officers found a woman hiding from her trafficker behind the hotel.

g. In August 2015, police respond to a **female rape victim. She was at a nearby restaurant when she saw a man who used to be her pimp.** He took her back to the Fulton Industrial Red Roof and raped her.

h. In May 2016, police take reporters undercover when they are investigating prostitutes and johns. The report discusses the pervasiveness of prostitution at the hotel.[27]

i. In August 2017, a British news agency filmed a report on sex trafficking in Atlanta, prominently featuring the Fulton Industrial Red Roof and the surrounding area, including showing prostitutes or sex trafficking victims on and around the Fulton Industrial Red Roof property.[28]

---

[27] Aaron Diamant, *Loophole helps cheap hotels serve as safe havens for violent crime,* WSB-TV, May 20, 2016, https://www.wsbtv.com/news/2-investigates/loophole-lets-cheap-hotels-serve-as-safe-havens-for-prostitutes-pimps-and-drug-dealers/292230950/ , (last visited Oct. 23, 2020).

[28] Hannah Thomas-Peter, *Modern Slavery: Inside Atlanta's Fight Against Sex Trafficking*, Sky News (Aug. 14, 2017) *available at*: https://news.sky.com/story/modern-slavery-inside-atlantas-fight-against-sex-trafficking-10988085 (last visited Oct. 23, 2020).

165.

RRI and/or RRF requires the owner of the Fulton Industrial Red Roof, like all Red Roof Inns, to send all safety and security reports, including crime and incident reports such as the above, directly to RRI and/or RRF. RRI and/or RRF and Sai knew or should have known of these incidents and others that occurred at the hotel before and during Plaintiff's sex trafficking at the Fulton Industrial Red Roof.

166.

As a direct and proximate result of RRI and/or RRF and Sai's acts and omissions, Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

**D. Plaintiff's sex trafficking at the Red Roof Airport South**

167.

Plaintiff was trafficked for sex at the Red Roof Airport South, where she was an invitee, on multiple visits in 2018 and 2019.

168.

RRI and/or RRF and HJA knew of, condoned, and/or permitted widespread prostitution at the Red Roof Airport South, and should have known of sex trafficking at the Red Roof Airport South, over which RRI and/or RRF and HJA

exercised control, because such activities were a continuous presence in that building for more than a decade before the building became a Red Roof Inn. RRI and/or RRF evaluated this business in 2018 and decided it was an appropriate location to become a Red Roof hotel, at which time HJA became the franchisee of the hotel.

169.

Plaintiff was trafficked for sex in this building as a minor, from the time she was 15 in 2007, until as recently as 2019. Plaintiff was trafficked for sex in this building on scores of separate visits when the building was branded as other hotels. Plaintiff's trafficking in this building was a constant fact of her life from 2007 through 2019. RRI and/or RRF and HJA knew or should have known of the longstanding history of sex trafficking and prostitution at this hotel.

170.

Plaintiff was not the only minor trafficking victim at the hotel. From 2007 through 2009, Plaintiff's sister—also a minor—was trafficked with her. Her younger sister was trafficked in this building beginning at the age of 14. Both sisters were at times trafficked in the same room, in different rooms, and each exhibited similar signs of victimization, and also had a number of daily male buyers who visited the same room.

171.

Plaintiff was trafficked for weeks and months at a time in this building, including when it was the Red Roof Airport South and HJA was the franchisee of the same hotel.

172.

Plaintiff was trafficked at the Red Roof Airport South for approximately six months in 2019.

173.

Plaintiff's sex trafficker operated openly and brazenly at the Red Roof Airport South, as did a number of other sex traffickers. When Plaintiff was trafficked at the Red Roof Airport South, she was aware of more than 10 other sex traffickers operating at the hotel and more than 20 other victims being trafficked for sex at the hotel. As a result, a very large number of buyers frequented the hotel each day.

174.

In fact, the Red Roof Airport South is notorious with traffickers and buyers alike. Buyers frequently drove around the hotel to "cruise" for victims and prostitutes who were visible inside and outside the hotel. Plaintiff and other trafficking victims frequently appeared throughout the hotel and on the hotel

premises and approaches wearing very little clothing. Hotel staff saw the girls and their inappropriate and victimized appearance and knew or should have known Plaintiff was a victim of sex trafficking occurring at the Red Roof Airport South.

175.

Defendants RRI and/or RRF and HJA knew or should have known of, condoned, and/or permitted widespread prostitution and sex trafficking at the Red Roof Airport South, over which RRI and/or RRF and HJA exercised control, including Plaintiff's sex trafficking.

176.

Employees at the Red Roof Airport South acted as lookouts for Plaintiff's sex trafficker and kept Plaintiff's sex trafficker informed of police activity at the hotel.

177.

Employees at the Red Roof Airport South purchased drugs from Plaintiff's sex trafficker at the Red Roof Airport South.

178.

While Plaintiff was trafficked at the Red Roof Airport South, an average of 5-6 older men visited the sex trafficker's rooms each day, each for short periods of time. RRI and/or RRF and HJA knew or should have known that the number of

daily, older male visitors to the room was obviously indicative of not only prostitution, but also of sex trafficking, and RRI and/or RRF and HJA negligently failed to control or monitor the frequent male visitors.

179.

Plaintiff was frequently beaten by her trafficker at the Red Roof Airport South. On multiple occasions, Plaintiff ran from the room at the Red Roof Airport South with visible bruises and welts. Employees at the Red Roof Airport South saw Plaintiff running through the hotel after beatings and her continued victimization. Employees at the Red Roof Inn South saw Plaintiff's trafficker physically constraining her and dragging her through the hotel to the room where she was trafficked.

180.

While Plaintiff was trafficked at the Red Roof Airport South, her trafficker directed hotel employees not to enter her room. Plaintiff's trafficker arranged to pick up towels and other items directly from housekeeping instead of allowing housekeeping into the room. This violated RRI and/or RRF's and HJA's stated policy that required hotel staff to physically enter a room at least every three days.

181.

Staff at the Red Roof Airport South allowed the side doors of the hotel to stay propped open to allow the frequent buyers of commercial sex to more easily and quickly access victims at the hotel for sex, including Plaintiff. This significant security risk and benefit to purchasers of commercial sex is confirmed by several publicly available online reviews of the hotel.

182.

Plaintiff frequently interacted with the hotel staff and managers at the Red Roof Airport South, who knew or should have known Plaintiff was a victim of sex trafficking occurring at the Red Roof Airport South.

183.

While she was trafficked at the Red Roof Airport South, Plaintiff's rooms evidenced numerous well-known and visible signs of sex trafficking of which RRI and/or RRF and HJA knew or should have known. Frequently, the trash cans in the rooms in which Plaintiff was trafficked contained an extraordinary number of used condoms, the rooms contained multiple cell phones, and Plaintiff frequently requested an excessive amount of towels from housekeeping.

184.

Pursuant to RRI and/or RRF's system standards and the applicable

Franchisor Contracts, RRI and/or RRF executives regularly performed unannounced and sometimes anonymous inspections of the Red Roof Airport South property, operations, and records to ensure the property was maintained according to RRI and/or RRF's standards. The prostitution and sex trafficking activity at the Red Roof Airport South was apparent to RRI and/or RRF's inspectors.

185.

The Red Roof Airport South and its approaches were well known for crime, prostitution, and minor sex trafficking.

186.

RRI and/or RRF and HJA knew or should have known of other sex crimes at the hotel in the years and months before Plaintiff was trafficked for sex at the Red Roof Airport South. Specifically, and based on publicly available information and police reports, RRI and/or RRF and HJA knew or should have known of the following sex crimes, among others, occurring on the premises and approaches:

a. On or about October 2010, police responded to a call reporting prostitution at the hotel.
b. On or about July 5, 2011, police responded to a call reporting two incidents of prostitution at the hotel.

c. On or about November 2011, police conducted a sting operation targeting prostitutes and buyers on Old National Highway. Officers told reporters that "prostitution is a significant issue on Old National Highway."[29]

d. On or about November 14, 2011, police responded to an armed robbery at the hotel.

e. On or about May 28, 2013, police responded to an armed robbery at the hotel.

f. On or about March 23, 2014, police responded to a rape or attempted rape at the hotel.

g. On or about June 12, 2014, police responded to an armed robbery at the hotel.

h. On or about June 13, 2014, police responded to a call reporting prostitution at the hotel.

i. On or about January 23, 2017, police responded to an armed robbery at the hotel.

---

[29] Tom Jones, *College Park Police Bust Prostitute, Johns in Undercover Sting*, WSB-TV2 (Nov. 10, 2011) https://www.wsbtv.com/news/college-park-police-bust-prostitutes-johns-underco/240658165/ (last visited Oct. 23, 2020).

j. On or about January 25, 2017, police responded to a rape or attempted rape at the hotel.

k. On or about June 29, 2017, police responded to an armed robbery at the hotel.

l. On or about February 15, 2018, seven different cases of prostitution at the hotel were responded to by the College Park Police Department.

m. On or about April 16, 2018, police responded to an armed robbery at the hotel.

n. On or about August 3, 2018, police responded to an armed robbery at the hotel.

o. On or about August 13, 2018, police responded to an armed robbery at the hotel.

p. On or about August 14, 2018, police responded to two reports of armed robbery at the hotel.

187.

RRI and/or RRF requires the owner of the Red Roof Airport South, including HJA, to send all safety and security reports, including crime and incident reports such as the above, directly to RRI and/or RRF. RRI and/or RRF and HJA knew or should have known of sex trafficking, prostitution, and other criminal

activity existing at the Red Roof Airport South prior to Plaintiff's sex trafficking at the Red Roof Airport South.

188.

RRI and/or RRF and HJA had actual and constructive knowledge of prostitution, sex trafficking, and other criminal activity existing on the property and in the surrounding area prior to Plaintiff's sex trafficking. RRI and/or RRF and HJA knew or should have known of these and other violent crimes occurring on their premises and approaches.

189.

RRI and/or RRF and HJA had actual or constructive knowledge of publicly available online reviews of the Red Roof Airport South reporting widespread prostitution and crime occurring at the hotel. RRI and/or RRF currently represents that "our president receives all of our TripAdvisor reviews to his email daily."

190.

RRI and/or RRF and HJA knew or should have known of a December 2016 review stating:

> Prostitutes were literally everywhere—including the next room having sex, which we clearly heard loudly at 3:30 a.m.

RRI and/or RRF and HJA knew or should have known of a March 2017 review stating:

> Used needle found in room. Not for a family. Full of drugs and prostitutes.

RRI and/or RRF and HJA knew or should have known of a September 2017 review stating:

> Prostitutes and drugs during the late night.

RRI and/or RRF and HJA knew or should have known of an October 2017 review stating:

> Prostitutes being locked up out front.

RRI and/or RRF and HJA knew or should have known of a May 2018 review stating:

> This hotel was so bad I refused to stay. I was met at the door by a prostitute. . . . The smell of cigarettes and marijuana was so overpowering. Why do the[y] have a pad lock system set up on the outside of the door? And the blood and bodily fluid stains on the couch were disturbing. This facility should be condemned.

RRI and/or RRF and HJA knew or should have known of an October 2018 review stating:

> For 80$ I should have been able to sleep with no problems but no there was prostitutes arguing and slamming doors.

RRI and/or RRF and HJA knew or should have known of a 2019 review stating:

> Hookers walk the street outside of the hotel at night and the early morning hours. This hotel isn't one I would recommend.

191.

As a direct and proximate result of RRI and/or RRF and HJA's acts and omissions, E.F. suffered substantial physical, emotional, and psychological harm and other damages.

## COUNT I
## NEGLIGENCE ALLEGATIONS AGAINST DEFENDANTS

192.

Plaintiff incorporates paragraphs 1-191 as if fully set forth herein.

193.

Defendants knew or should have known the steps to take to identify, address, and deter sex trafficking at the Atlanta Red Roof Inns, including E.F.'s sex trafficking.

194.

In spite of their knowledge about the illegal activity at the Atlanta Red Roof Inns, including multiple reports and arrests related to prostitution and other crimes prior to Plaintiff's trafficking, Defendants negligently failed to implement any

measures to protect their invitees, including Plaintiff, from becoming victims of sex trafficking and minor sex trafficking at the Atlanta Red Roof Inns and continued their venture to profit from the operation of the Atlanta Red Roof Inns and the prostitution, sex trafficking, and minor sex trafficking incorporated into the Atlanta Red Roof Inns' daily operations.

195.

Defendants negligently failed to implement policies and procedures to prevent, identify, and deter prostitution and sex trafficking in its hotels and to ensure they were not profiting from sex trafficking, as required by state and federal law.

196.

At all relevant times, Defendants controlled the operation and management of the Atlanta Red Roof Inns and had the legal duty to keep the premises in a state consistent with due regard for the safety of their invitees, including Plaintiff. Defendants breached their duties and failed to act as similarly situated businesses would in like circumstances.

197.

Prior to and including the time when Plaintiff was trafficked at the Atlanta Red Roof Inns, Defendants negligently maintained, inspected, secured, patrolled,

and managed the subject Atlanta Red Roof Inns. Defendants had knowledge, both actual and constructive, of the need to properly maintain, secure, inspect, patrol, and manage the premises, but negligently failed to exercise ordinary care, thereby creating an unreasonable risk of injury to invitees, including Plaintiff.

198.

Defendants had actual and constructive knowledge of the dangerous and hazardous conditions existing at the Atlanta Red Roof Inns due to their own knowledge, the knowledge of their employees and agents, and due to the prior criminal activity and dangers associated with the property and surrounding high crime areas.

199.

Plaintiff's sex trafficking and minor sex trafficking was foreseeable to Defendants because they knew or should have known about the actual events with Plaintiff, as well as the history of prostitution and sex trafficking at the Atlanta Red Roof Inns and other hotels in the areas and the history of criminal activity at and around the Atlanta Red Roof Inns and in the surrounding high-crime areas. Thus, Defendants owed a duty to invitees like Plaintiff to exercise ordinary care in keeping the premises and approaches safe from criminal activity, especially sex trafficking and minor sex trafficking.

200.

Defendants breached the duty owed to Plaintiff by failing to exercise ordinary care to keep their premises safe and negligently permitting prostitution and other criminal activity, especially minor sex trafficking, to exist and remain at the Atlanta Red Roof Inns.

201.

Defendants knew of, or in the exercise of ordinary care, should have known of the dangerous and hazardous conditions existing on the premises, and the failure to maintain, inspect, secure, patrol, and manage the premises, and that these conditions were likely to, and did, result in prostitution, sex trafficking, and minor sex trafficking previously at the Atlanta Red Roof Inns and also to Plaintiff.

202.

Defendants had actual and constructive knowledge of criminal activity, including prostitution, sex trafficking, and minor sex trafficking at and around the Atlanta Red Roof Inns prior to Plaintiff's sex trafficking and minor sex trafficking.

203.

Despite their actual and constructive knowledge of criminal activity, including prostitution, sex trafficking, and minor sex trafficking, Defendants

negligently failed to protect invitees, including Plaintiff, from the risks of sex trafficking and minor sex trafficking and other violent crimes.

204.

Despite their actual and constructive knowledge of criminal activity, Defendants negligently failed to warn Plaintiff or other invitees of the dangers at and around the Atlanta Red Roof Inns.

205.

Despite their actual and constructive knowledge of prostitution, sex trafficking, minor sex trafficking and other criminal activity, Defendants negligently failed to maintain adequate security devices and personnel to permit proper use of the property, thereby causing an unreasonable risk of injury to invitees, including Plaintiff.

206.

Despite their actual and constructive knowledge of prostitution, sex trafficking, and minor sex trafficking and other criminal activity, Defendants negligently failed to maintain policies, procedures, or systems of investigating, reporting and warning of sex trafficking and minor sex trafficking and other crimes, and negligently maintained the Atlanta Red Roof Inns.

207.

Despite their actual and constructive knowledge of criminal activity, Defendants failed to take appropriate action to remedy or reduce the danger to their invitees and allowed the dangerous environment at the Atlanta Red Roof Inns to worsen and continue to exist unabated, thereby creating a nuisance.

208.

Because Defendants had knowledge of, or in the exercise of reasonable care should have had knowledge of the dangerous environments at and around the subject premises, Defendants are liable for the negligent supervision, hiring, training, and retention of their employees and the entrustment of said property to its agents and employees. Said negligence proximately caused the damages and injuries to Plaintiff.

209.

Defendants negligently represented to invitees, including Plaintiff, that the Atlanta Red Roof Inns were properly maintained and that the properties were safe.

210.

Defendants were negligent and said negligence proximately caused Plaintiff's injuries in the following ways, to-wit:

a) Negligently violating O.C.G.A. § 51-3-1 by failing to use ordinary

care to keep the premises safe;

b) Negligently failing to keep the premises in a state of good repair;

c) Negligently violating O.C.G.A. § 41-1-1 by creating and maintaining a nuisance;

d) Negligently failing to provide appropriate and effective security personnel during Plaintiff's sex trafficking and minor sex trafficking at the hotels;

e) Negligently failing to properly inspect and maintain the premises;

f) Negligently failing to properly train and supervise their employees regarding prostitution and minor sex trafficking at the hotels;

g) Negligently failing to properly retain, hire, train, and supervise said employees;

h) Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

i) Negligently failing to respond to online reviews and publicly available information;

j) Negligently failing to prevent loitering and trespassing;

k) Negligently failing to remove loiterers and trespassers;

l) Negligently failing to inspect, patrol, or appropriately monitor the

properties;

m) Negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage, cameras, patrols, inspections, physical, and other landscaping adjustments, and other measures available;

n) Negligently failing to remediate a long history of crime at the Atlanta Red Roof Inns and the areas nearby;

o) Negligently failing to warn invitees of known hazards at the properties; and

p) Negligently representing to invitees that the properties were safe.

211.

Each of the foregoing acts and omissions constitute an independent act of negligence on the part of Defendants and one or more or all above stated acts were the proximate causes of the injuries sustained by Plaintiff. Defendants are liable for E.F.'s injuries sustained, pain and suffering, the expenses of treatment and all other elements of damages allowed under the laws of Georgia and federal law, including all special, compensatory, incidental, consequential, economic, and punitive damages.

212.

Defendants are liable for the sex trafficking and minor sex trafficking of Plaintiff.

213.

Defendants' negligence discussed in this count was a cause in fact and a proximate cause of Plaintiff's substantial physical, emotional, and psychological harm and other damages.

**COUNT II**
**TVPRA AGAINST ALL DEFENDANTS**
**18 U.S.C. § 1595(a)**

214.

Plaintiff incorporates paragraphs 1-213 as if fully restated herein verbatim.

215.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture that they knew or should have known engaged in acts in violation of the TVPRA. Plaintiff was sex trafficked at the Atlanta Red Roof Inns, first as a minor, and later as an adult as a result of force, fraud, and/or coercion.

216.

Defendants knowingly benefitted from Plaintiff's sex trafficking by

receiving a percentage of the revenue generated by the operation of each of the Atlanta Red Roof Inns, including a percentage of the revenue generated from the rate charged on the rooms in which Plaintiff was trafficked.

217.

Defendants participated in the motel ventures described and knew or should have known that the ventures violated the TVPRA. Defendants further engaged in sex trafficking ventures by providing to Plaintiff's trafficker the necessary venue for Plaintiff's sex trafficking. In the course of these ventures, multiple men paid to have sex with Plaintiff at the Atlanta Red Roof Inns.

218.

The ventures in which Defendants participated were in or affecting interstate commerce.

219.

Defendants knew or should have known the ventures engaged in acts in violation of the TVPRA because Defendants, its agents and representatives, had the opportunity to observe Plaintiff at the hotel, with and without her trafficker, the signs of sex trafficking and minor sex trafficking exhibited by Plaintiff, her trafficker, and the rooms in which she was trafficked, the frequent traffic of male buyers to Plaintiff's rooms, the large number of other traffickers and sex

trafficking victims exhibiting similar signs and behaviors of sex trafficking, and the accommodations made by hotel staff to assist the sex traffickers' operations at the Atlanta Red Roof Inns while Plaintiff was trafficked there.

220.

Defendants knew or should have known the ventures engaged in acts in violation of the TVPRA because Defendants, their agents and representatives knew or should have known of other sex trafficking, minor sex trafficking, and sex crimes at the hotel before Plaintiff was trafficked for sex at the Atlanta Red Roof Inns.

221.

Defendants are directly and vicariously liable under § 1595(a) for their own actions and the actions of their agents and representatives.

222.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in these sex trafficking ventures.

223.

Defendants are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C.

§ 1595(a).

224.

Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff, whose damages were proximately caused by the acts discussed herein.

## VIOLATIONS OF THE GEORGIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("Georgia RICO") AGAINST ALL DEFENDANTS

225.

Plaintiff incorporates paragraphs 1–224 as if fully set forth herein.

226.

Defendants acquired or maintained, directly or indirectly, an interest in money through a pattern of racketeering activity at each and all the Atlanta Red Roof Inns.

227.

The conduct in violation of Georgia RICO in which Defendants participated by committing an act of racketeering activity or an overt act continued to within five years of the filing of this action.

228.

Buyers of commercial sex in Atlanta who post details of their commercial sex activity online have stated that as recently as September and October of 2020 they have purchased commercial sex at the Atlanta Red Roof Inns.

229.

Upon information and belief, and as evidenced by the Plaintiff's experiences in the subject Atlanta Red Roof Inns, the continuing reference to prostitution in online reviews, the repeated arrests related to prostitution and sex trafficking, the publication of reports regarding prostitution and sex trafficking at Red Roof Inns in Atlanta, and the direct communications to RRI and/or RRF, the conduct of the Defendants in violation of O.C.G.A. § 16-14-4 has not terminated.

**A. Acts of Racketeering Activity**

**i. Keeping a Place of Prostitution**

230.

While Plaintiff was trafficked for sex at the Atlanta Red Roof Inns, she performed sexual acts in exchange for money or other items of value.

231.

Defendants kept a place of prostitution by receiving money and by acting individually, as parties to the crime, and as co-conspirators, while having and

exercising control over the use of one or all of the Atlanta Red Roof Inns, which offered seclusion and shelter for the practice of prostitution, knowingly granting and permitting the use of that location for the purpose of prostitution, in violation of O.C.G.A. § 16-6-10. This constitutes racketeering activity. O.C.G.A. § 16-14-3(5)(A)(vii).

232.

While Defendants had control over the use of one or all of the Atlanta Red Roof Inns, places which offered seclusion or shelter for the practice of prostitution, they knowingly granted and permitted their use for the purpose of prostitution.

**B. The Acts of Racketeering Activity Formed a Pattern**

233.

Defendants engaged in more than two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions.

234.

The acts of racketeering activity were interrelated by distinguishing characteristics and were not isolated incidents.

235.

Defendants' acts of racketeering had the same or similar intents, including but not limited to obtaining money, directly or indirectly, through a pattern of racketeering activity.

236.

Defendants' acts of racketeering had the same or similar results, in that they obtained money or facilitated the obtaining of money, directly or indirectly, through a pattern of racketeering activity.

237.

Defendants' acts of racketeering had the same or similar accomplices, including, but not limited to, sex traffickers, hotel owners, hotel management, and hotel chain management.

238.

Defendants' acts of racketeering had the same or similar victims, including, but not limited to, Plaintiff and other victims who were forced to engage in sexual acts in exchange for money at one or all of the Atlanta Red Roof Inns and were the victims of other acts of racketeering activity committed at the Atlanta Red Roof Inns.

239.

Defendants' acts of racketeering had the same or similar methods of commission, including but not limited to harboring, holding, confining, and detaining persons who were forced to engage in sexual acts in exchange for money at the Atlanta Red Roof Inns.

**COUNT III**
**VIOLATIONS OF O.C.G.A. § 16-14-4(a)**
**AGAINST ALL DEFENDANTS**

240.

Plaintiff incorporates paragraphs 1–239, as if fully set forth herein.

241.

As set forth above, Defendants violated O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in money through a pattern of racketeering activity.

242.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' violations of Georgia RICO.

243.

Defendants are liable to Plaintiff for three times her damages in an amount to be proven at trial, her attorneys' fees, and her costs of investigation and litigation.

244.

Defendants' wrongful actions constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiff for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

245.

Because Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## COUNT IV
## VIOLATIONS OF O.C.G.A. § 16-14-4(c)
## AGAINST ALL DEFENDANTS

246.

Plaintiff incorporates paragraphs 1–245 above, as if fully set forth herein.

247.

Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire money through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4(a).

248.

Defendants knowingly and willfully joined a conspiracy at each of the Atlanta Red Roof Inns, each of which contained a common plan or purpose to commit two or more acts of racketeering activity, through which an interest in and control of money would be acquired and maintained, either directly or indirectly from one or all of the Atlanta Red Roof Inns.

249.

Defendants also violated O.C.G.A. § 16-14-4(c) by endeavoring to violate O.C.G.A. § 16-14-4(a) by acquiring or maintaining, directly or indirectly, an interest in and control of money through a pattern of racketeering activity.

250.

Defendants committed numerous acts of racketeering activity and overt acts in furtherance of its individual endeavors and conspiracies at each of the Atlanta Red Roof Inns.

251.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of the violations of Georgia RICO committed by Defendants.

252.

Defendants are liable to Plaintiff for three times her damages in an amount to be proven at trial, her attorneys' fees, and the costs of investigation and litigation.

253.

Defendant's wrongful actions constitute willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences, rendering them liable to Plaintiff for punitive damages pursuant to O.C.G.A. § 51-12-5.1.

254.

Because Defendants acted with the specific intent to cause harm, there is no limitation regarding the amount that may be awarded as punitive damages.

## DAMAGES

255.

Plaintiff incorporates paragraphs 1–254 as if fully set forth herein.

256.

As a proximate and foreseeable result of Defendants' negligence, violations of Georgia RICO and the TVPRA, Plaintiff sustained numerous indivisible harms, personal injuries, mental and emotional pain and suffering, experienced mental

anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and/or federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and/or federal law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and/or federal law, including, but not limited to:

a) Personal injuries;

b) Past, present and future conscious pain and suffering;

c) Loss of enjoyment of life;

d) Medical expenses;

e) Mental anguish and emotional distress;

f) Loss of past, present, and future wages;

g) Incidental expenses;

h) All special, compensatory, economic, punitive, and other damages permissible under Georgia law; and

i) Consequential damages to be proven at trial.

257.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

258.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia statutory and/or federal common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her jointly and severally against Defendants for the following:

a) Plaintiff be awarded actual damages in amounts to be shown at trial from Defendants;

b) Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance

with the enlightened conscience of an impartial jury from Defendants jointly and severally;

c) Plaintiff be awarded a trial by jury; and

d) Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

This 19th day of March, 2021.

Respectfully submitted,

*/s/ Richard W. Hendrix*
Richard W. Hendrix
rhendrix@finchmccranie.com
Georgia Bar No. 346750
David H. Bouchard
david@finchmccranie.com
Georgia Bar No. 712859

FINCH McCRANIE, LLP
225 Peachtree Street NE
1700 South Tower
Atlanta, Georgia 30303
(404) 658-9070 – Telephone
(404) 688-0649 – Facsimile

**ANDERSEN, TATE & CARR, P.C.**

/s/ Patrick J. McDonough
Patrick J. McDonough
Georgia Bar No. 489855

pmcdonough@atclawfirm.com
Jonathan S. Tonge
Georgia Bar No. 303999
jtonge@atclawfirm.com
Attorneys for Plaintiff
Tyler Dillard
Georgia Bar No. 115229
tdillard@atclawfirm.com

**ANDERSEN, TATE & CARR, P.C.**
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
Phone: (770) 822-0900
Facsimile: (770) 822-9680

*Attorneys for Plaintiff*

**CERTIFICATE OF COMPLIANCE**

This is to certify that the foregoing **Plaintiff's First Amended Complaint for Damages** has been prepared with a font and point selection approved by the Court in LR 5.1., NDGA. Specifically, the above-mentioned pleading was prepared using Times New Roman font of 14-point size.

Respectfully submitted,

*/s/ Richard W. Hendrix*
Richard W. Hendrix
rhendrix@finchmccranie.com
Georgia Bar No. 346750
David H. Bouchard
david@finchmccranie.com
Georgia Bar No. 712859

FINCH McCRANIE, LLP
225 Peachtree Street NE
1700 South Tower
Atlanta, Georgia 30303
(404) 658-9070 – Telephone
(404) 688-0649 – Facsimile

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on today's date I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

**Attorneys for Defendant**
Admir Allushi
P. Michael Freed
Charles Kyle Reed
Lewis Brisbois Bisgaard & Smith, LLP
Suite 2900
1180 Peachtree St., N.E.
Atlanta, GA 30309-3521

**Co-Counsel for Plaintiff**
Patrick J. McDonough
Jonathan S. Tonge
Tyler Dillard
Anderson, Tate & Carr, P.C.
One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097

Respectfully submitted this 19th day of March, 2021.

*/s/ Richard W. Hendrix*
Richard W. Hendrix
rhendrix@finchmccranie.com
Georgia Bar No. 346750
David H. Bouchard
david@finchmccranie.com
Georgia Bar No. 712859

FINCH McCRANIE, LLP
225 Peachtree Street NE
1700 South Tower
Atlanta, Georgia 30303
(404) 658-9070 – Telephone
(404) 688-0649 – Facsimile

*Attorneys for Plaintiff*